No. 74,976

STATE OF KANSAS, *Appellee*, v. LANCE CHARLES CELLIER, *Appellant*.

(948 P.2d 616)

Opinion filed October 31, 1997.

*Jean K. Gilles Phillips*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Joe E. Lee*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Lance Charles Cellier, from his convictions for first-degree premeditated murder and aggravated kidnapping. The defendant challenges the admissibility of four statements, the voluntariness of his waiver of his *Miranda* rights, his competency to stand trial, the constitutionality of the competency statute, and the sufficiency of the evidence to find that he was not insane when he committed the acts at issue.

It is not disputed that Cellier killed Scott Payton, age 19, on February 25, 1994, by shooting him at close range with a shotgun. In order to understand this sad case, it is necessary to set out the bizarre facts that preceded Payton's death.

Cellier has a history of mental disorders. In August 1993, Cellier heard a story at a party about a person who had his penis cut off. Cellier believed that Payton, along with some other men, had cut off the man's penis and had set up Cellier to make it look like he (Cellier) cut off the man's penis. Cellier also believed that the injured man had connections to the Mafia and that the Mafia was out to get Cellier and his family to take revenge for Cellier's apparent participation in cutting off the man's penis. Cellier rationalized that if he committed suicide, the Mafia would be satisfied and would not kill his family. In an attempt to commit suicide, Cellier ingested 100 aspirin and model airplane glue. Cellier was taken to a hospital in Emporia and survived.

As a result of his suicide attempt, Cellier was committed to the Topeka State Hospital for an evaluation. The hospital diagnosed Cellier as suffering from a severe mental disorder, paranoid schizophrenia. Cellier was released from the hospital on an outpatient basis to the Mental Health Center of East Central Kansas.

The Mental Health Center assigned Cellier's case to a student intern who met with Cellier on a weekly basis. During these meetings, Cellier talked about finding employment and his future plans. Cellier told the intern that he had not had any delusional thoughts or paranoia, and he appeared to be fine to the intern. At a meeting on February 17, 1994, Cellier told the intern that he had lost his medical card and that he needed to get a new one.

Cellier met only twice with a psychiatrist from the Mental Health Center—on December 6, 1993, and on February 8, 1994. The psychiatrist asked Cellier if he had been hallucinating and Cellier said, "No." Cellier answered the doctor's questions appropriately, appeared to be in touch with reality, and stated that he was planning to move to Texas to look for a job. The doctor did not see any evidence of psychosis.

Cellier did not take his medication as prescribed. From pharmacy records, it appears that Cellier only took his medication on and off and that he potentially could have been without medication for 48 of the 50 days immediately prior to February 25, 1994, the day of the shooting.

Cellier's friends testified about his behavior and actions once he was released from the Topeka State Hospital on December 7, 1993, and before the shooting occurred on February 25, 1994. A week or two before the shooting, Cellier showed his friend, Nishantha Pitigala, a long-barrelled gun he had in the trunk of his car. Cellier told Pitigala that he bought the gun for protection and to eliminate somebody. Cellier said he was going to shoot Scott Payton. When Pitigala questioned Cellier about his plans to shoot Payton, Cellier would not give a straight answer. Instead, Cellier talked about the Mafia trying to kill him. Pitigala knew Cellier had talked about the Mafia before being committed to the Topeka State Hospital, and he testified that Cellier also had these delusions in February, shortly before the shooting.

Another friend of Cellier's, Donald Miles, testified that a week or two before the shooting, he visited Cellier and Cellier asked for help in assembling a shotgun that he had just purchased. Miles said that Cellier had also purchased shells from Wal-Mart and a little tape recorder which he planned to use to record a confession from Payton. Cellier carried the gun in his car and said he needed it for protection. Miles and Cellier could not assemble the gun, so they took it to a shop to be assembled. After the gun was assembled, the two practiced shooting it. Several days before the shooting, Cellier told Miles that he was not taking his medication. Miles testified that during this time, Cellier got progressively more "whacked."

In February 1994, Cellier told Miles for the first time that he was going to kill someone. Later, Cellier specified that the person he was going to shoot was Payton. On February 25, 1994, the day of the shooting, Cellier stopped by Miles' home at 8:30 a.m. Miles said that Cellier was very paranoid and hyper. Cellier stated that he was going to get Payton to confess to a crime on tape, kill Payton, and then take the tape to the authorities. At one point, Cellier talked about shooting a person's penis off, and Miles told Cellier that he could not do that because it would kill the person. Miles also stated that Cellier had discussed a plan to cover up the murder because he had plans for his life and he did not have time to go to prison. Cellier told Miles that part of his plan involved turning himself in after he shot Payton.

At 11:30 a.m. Cellier drove Miles to work. He then went to Payton's house. According to Payton's father, Payton and Cellier left the house together shortly after Cellier arrived.

At approximately 12:15 p.m., Cellier entered the lobby of the Lyon County Sheriff's office, bloody and hysterical. Cellier was yelling for help and stating that he had shot someone. When Officer Eric Brunner tried to find out what had happened, Cellier told him he had shot somebody and he thought the person was dead. Cellier stated that he and Payton had been hunting when Payton tried to shoot him (Cellier) for being a "fag." So, Cellier took the gun from Payton and shot him in self-defense. Cellier gave directions to the shooting scene, but the directions were non-sensical. The officer looked at Cellier's car and noticed blood splattered on the doors and fenders.

The Lyon County Sheriff took Cellier from the lobby to an empty office and asked Cellier what had happened. Cellier stated that he and Payton went to smoke marijuana together and that Payton had pulled a gun on him and said, "I'm going to shoot you, you fag." At this point, Cellier claimed he took the gun away from Payton and shot Payton in self-defense. Cellier then came to the sheriff's office and said he was afraid Payton might be dead. Cellier agreed to direct the sheriff to the shooting scene, and he was escorted to the sheriff's car. At this time, Cellier was not handcuffed; he was simply walking with the officers. When they got to the car,

the sheriff sat in the driver's seat, Cellier sat in the back passenger-side seat, and another officer sat in the back driver's-side seat.

Despite erratic directions, Cellier led the sheriff to the scene of the shooting. There, in a field, lay the body of Payton. During this period of time, Cellier was responding to questions. As they got closer to the crime scene, Cellier got more agitated, and when he could see the body, he became upset and started saying, "Oh, I killed him, I killed him." A third officer, who had followed in a different car, walked into the field and checked the body. He confirmed that the victim was dead. The victim had been shot in the abdomen. Cellier told the officer that the victim was Scott Payton, and then he said, "I shot him, I shot him." At this time, the officer who sat in the back seat of the sheriff's car with Cellier arrested and handcuffed Cellier. As they left the crime scene, the officer advised Cellier of his *Miranda* rights, and Cellier indicated that he understood these rights.

Upon return to the sheriff's office, Cellier was questioned by Officer Gary Sadowski and Detective Carlton Heller. The interview began at 1:32 p.m. on February 25, 1994. The officers did not check into Cellier's psychiatric status. The officers gave Cellier a copy of a form entitled, "Interrogation: Advise [sic] of Your Rights," which Cellier signed and the officers witnessed. Cellier told the officers he understood his rights and was willing to waive those rights and answer questions.

Before the officers were able to ask any questions, Cellier admitted that he had not told the truth earlier because he did not shoot Payton in self-defense. Officer Sadowski told Cellier to tell them what actually had happened.

Cellier told the officers that the whole story began about 3 ½ years ago when a person named Jim Rhoades made a pornographic tape of Cellier without his knowledge. Cellier explained that he was not aware of this tape until it turned up in Houston, Texas, in the hands of Richie Vrandt. After watching the tape, Vrandt supposedly decided to come to Emporia and have sex with Cellier, but Cellier never saw Vrandt. Instead, Cellier was told that Jim Rhoades, Steve Gibson, and the victim, Scott Payton, had cut off Vrandt's penis while he was in Emporia and thrown the penis into

a K-Mart parking lot. Vrandt supposedly had some connection with the Mafia, and Cellier became convinced he had been set up as the person to be blamed for cutting off Vrandt's penis. Cellier thought the Mafia was coming to Emporia to kill Rhoades, Gibson, Payton, and himself.

Cellier decided that he needed to get a taped confession from Payton stating that Cellier had not cut off Vrandt's penis. Cellier's plan was to point the gun at Payton and shoot his penis off, thereby convincing Payton to confess on tape. He would then take Payton to the hospital and turn the tape over to the FBI.

Cellier said he picked Payton up from his residence at approximately noon on February 25, 1994, to go to the river. When Cellier picked Payton up from his residence, he did so under the pretense that they were going out to the river to smoke marijuana. Cellier said no one else knew he was going to that location. They arrived at the river at about 12:10 p.m. Cellier retrieved the shotgun from the trunk, pointed it at Payton, and told Payton that he knew Payton had set him up. Payton said he did not know what Cellier was talking about, so Cellier shot him. Cellier intended to shoot Payton in the penis. However, his aim was off and the first shot hit Payton in the lower abdomen. Payton fell over backward, and his eyes rolled back in his head. Cellier said it was not until after he shot Payton the first time that he realized what a 12-gauge pump shotgun would do to someone. Cellier tried to get Payton to confess on tape. Realizing that Payton was dying, Cellier shot him two more times to cover it up. Asked to explain what he meant by cover it up, Cellier explained that he was going to put Payton in the trunk and take the body someplace else to hide it. Cellier could not get Payton's body into the trunk of his car, so he decided to turn himself in to the law enforcement officers.

The officers thought Cellier honestly believed he was telling the truth, and they decided they were dealing with a suspect who had delusional problems. Concerned with Cellier's mental state, the officers suspended the interview and sought the advice of a county attorney as to how to proceed.

After a discussion with the county attorney, Officer Sadowski and Detective Heller interviewed Cellier a second time. Con-

cerned that Cellier might assert an insanity defense, the objective of the second interview was to get Cellier to admit that he understood what he did was wrong and that he knew his conduct was in violation of the law. When the officers returned for the second interview, they asked Cellier if they could either videotape or audiotape the interview. Cellier said that he did not want the interview to be videotaped, but that he would allow them to audiotape the interview. The interview was audiotaped.

During the second interview, Cellier was again read his rights. The officers asked Cellier if he understood what the right to remain silent meant. Cellier replied that it meant whatever he said right then could be used against him in court. A short time later, the officers again asked Cellier if he realized that he did not have to talk to them. Cellier stated, "Right." Then, he immediately asked, "This [tape] won't be used in court, will it?"

During the interview, Cellier related the same story which he had previously explained. The officers asked Cellier if he shot Payton the second and third times to cover it up. Cellier replied that he shot Payton two more times "to kill him or something." The officers said they did not understand, and Cellier stated, "I think that I was thinking that he was going to die so I was gonna shoot a couple more times so he'd die then." Later, Cellier said, "I was going to try and cover up the crime and get rid of his body." The officers also asked Cellier if he understood what could happen for killing someone. He replied, "No, not exactly. What can happen?" The officers testified they understood Cellier's response to mean that he did not know if he would go to jail or receive the death penalty in Kansas. Officer Sadowski also asked Cellier if he knew why he was there, and his response was that he had just murdered somebody. When Cellier was asked about what he meant by murder he said, "I shot somebody with a shotgun."

This interview ended and later that same day, Cellier was interrogated again, this time by KBI Agent William Halvorsen. Agent Halvorsen advised Cellier of his *Miranda* rights prior to conducting the interview. Cellier indicated that he understood his rights and was willing to talk. Again, the interview was audiotaped. Cellier

related the same bizarre story. Cellier stated that he never intended to kill Payton.

As in the first two interviews, Agent Halvorsen again inquired about whether Cellier understood the nature of his conduct. Agent Halvorsen asked:

"Q: Let me ask you something Lance, when you shot him the second time, when you intended to kill him, in your mind is that right or wrong to do that?

"A: [By Cellier] I didn't know. I was just freakin' out.

"Q: Well is it right or wrong to kill somebody?

"A: Wrong.

"Q: And did you know that at the time?

"A: I wasn't thinking of it.

"Q: But you knew it, right? And it was one of the different ways to get it covered up?

"A: Yeah."

After this third interview, Agent Halvorsen took Cellier back out to the crime scene so Cellier could reenact the shooting. When they left the jail, it appeared Cellier was depressed, and Agent Halvorsen asked Cellier if he was all right. Cellier said he was not feeling well because he had just killed somebody that day. Cellier also expressed concern about going to hell and asked the officer if he believed that God would forgive him for what he had done that day. Halvorsen told Cellier that he was not an expert on that kind of thing but that he did believe God would forgive him.

Once at the crime scene, Cellier pointed out where Payton was standing when he shot him and where the car would have been when he tried to load Payton into the trunk. Halvorsen said that all of the facts Cellier told him in the interview and out at the crime scene matched and were consistent with the physical evidence which they found at the crime scene. Halvorsen was not able to find any evidence that was inconsistent with what Cellier had told him.

Several months later, Halvorsen talked to Cellier again. At that time, Cellier told Halvorsen that he originally thought it was the right thing to do to turn himself in. Now, since the State was seeking a hard 40 sentence, Cellier was not so sure he had done the

right thing, and he thought he should have disposed of the body and not turned himself in.

Cellier filed a motion to determine competency. Pursuant to this motion, Cellier was committed to Larned State Security Hospital for an evaluation, in accordance with K.S.A. 22-3302. A hearing was held on the issue of Cellier's competency. The trial court found Cellier competent to stand trial.

Cellier next filed a motion to suppress his confessions. The trial court held a suppression hearing and denied Cellier's motion to suppress.

At trial, Cellier argued that he was insane. The sole focus of the trial was Cellier's mental state. After hearing the testimony of several mental health experts, the trial court instructed the jury on insanity. The jury found that Cellier was not insane and found him guilty of premeditated murder and aggravated kidnapping. In the sentencing phase, the jury recommended a sentence of life, with the possibility of parole in 15 years for the murder conviction. Based on the jury's recommendation, the trial court sentenced Cellier to life in prison, with the possibility of parole in 15 years, for the murder conviction and to 97 months in prison for the aggravated kidnapping conviction, with the sentences to run consecutive to each other. Cellier appeals his convictions to this court.

## I. ADMISSIBILITY OF CONFESSIONS

During the investigation of this crime, the police took four statements from Cellier. The first statement occurred when Cellier walked into the sheriff's office and said he had shot someone. The police asked questions, and Cellier began to tell them some information about the shooting. Cellier then took the police to the scene of the crime and identified the victim. At this time, the police read Cellier his *Miranda* rights for the first time. After the police and Cellier returned to the sheriff's office, the police formally interviewed Cellier—his second interview. The police suspended the interrogation and called the county attorney to find out how to interview a delusional suspect. After some advice from the county attorney, the police read Cellier his *Miranda* warnings again and resumed the interview—Cellier's third interview. This third inter-

view was recorded with Cellier's permission. Later that day, a KBI agent came to the sheriff's office and interviewed Cellier again—Cellier's fourth statement, which was also tape recorded.

On April 20, 1995, Cellier filed a motion to suppress all of his statements. Cellier's counsel argued that the first statement should be suppressed because when Cellier arrived at the sheriff's office, he was escorted to an office and asked to explain what happened, then he was escorted to a police car and asked to direct law enforcement officers to the crime scene and to identify the victim, all without first being advised of his *Miranda* rights. Thus, Cellier argued that this first statement should be suppressed because it constituted custodial interrogation without proper *Miranda* warnings. According to Cellier's counsel, all subsequent statements given by Cellier were the fruit of this initial poisonous statement and should also be suppressed. Further, at the time of the subsequent interviews, Cellier was suffering from paranoid schizophrenia and was not on medication. As such, Cellier's counsel argued that Cellier was not capable of comprehending his right to counsel or his right to remain silent. Hence, Cellier's counsel asked the trial court to suppress all four of Cellier's statements, even though some of the statements had been prefaced with *Miranda* warnings.

The trial court held a suppression hearing on May 12, 1995. Dr. Roy Lacoursiere, a psychiatrist, testified at the suppression hearing on behalf of the State. Dr. Lacoursiere admitted that Cellier suffered from a delusional disorder and that, on the day of the shooting, his illness significantly manifested itself. Lacoursiere also admitted that Cellier actually believed he could get a confession out of Payton if he shot him in the penis and that if he shot Payton in the penis with a 12-gauge shotgun, it would not kill him. Lacoursiere listened to the taped interviews and opined that Cellier understood his *Miranda* rights when he gave his confessions.

Based on this testimony and the testimony of several other witnesses, the trial court denied Cellier's motion to suppress his statements. In so holding, the trial court found:

"(1) That the defendant was not in custody prior to receiving the *Miranda* warning from [the police officer] at the crime scene.

"(2) That the defendant received the *Miranda* warning in a timely manner and that said warning was sufficient to satisfy *Miranda* requirements.

"(3) That the defendant had the mental capacity to appreciate and understand the *Miranda* warning.

"(4) That the defendant's statements were knowingly and voluntarily made."

At trial, the State introduced evidence of all four of Cellier's statements. Cellier's counsel did not object to the admission of any of this evidence at trial. For instance, the following witnesses testified regarding Cellier's statements without any objection by defense counsel: Dawn Bainum; Eulah Houston; Eric Brunner; Clifford Hacker; Jeff Cope; Randall Thomas; Gary Sadowski; and Dr. Roy Lacoursiere. Cellier did not object to the admission of the State's Exhibit 99, the advice of rights form, nor did he object to the State's Exhibit 100, an audiotape of his third statement.

Cellier made only one objection in regard to the admission of his statements, and that objection was made during the testimony of KBI Special Agent Halvorsen. Cellier did not raise an objection when Halvorsen testified about Cellier's statements. However, Cellier did object when the State tried to enter Exhibit 92, an audiotape of his fourth statement, through Halvorsen. Cellier contended that the tape was cumulative because a tape of Cellier's third statement had already been admitted into evidence at trial. The trial court overruled this objection, and Cellier made no further objections regarding the admission of his statements into evidence.

On appeal, Cellier challenges the trial court's denial of his motion to suppress and the admission of his statements at trial. Cellier contends that the admission of his statements at trial violated the Due Process Clause of the 14th Amendment to the United States Constitution because the statements were the product of police coercion. Further, Cellier contends that the admission of his statements at trial violated K.S.A. 22-3215 because the statements were not freely and voluntarily given under the totality of the circumstances.

K.S.A. 60-404 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence

unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

"When . . . a motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal." *State v. Milo*, 249 Kan. 15, 18, 815 P.2d 519 (1991).

Cellier did not properly object to the admission of his statements at trial as a violation of the 14th Amendment or K.S.A. 22-3215. In fact, Cellier's counsel extensively questioned witnesses about Cellier's bizarre statements and his demeanor during such statements in order to support Cellier's insanity defense. Since Cellier willingly allowed the admission of these statements at trial, Cellier cannot now decide to challenge the admission of the statements on appeal simply because his trial strategy was unsuccessful. This issue fails because it has not been properly preserved for appeal.

## II. WAIVER OF *MIRANDA* RIGHTS

Cellier filed a motion to suppress his statements, claiming that he did not appreciate, comprehend, or understand his constitutional rights to remain silent or request assistance of counsel when he gave his confessions, due to his delusional thinking which impaired his mental facilities. Thus, Cellier alleged that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights under the totality of the circumstances when he agreed to make a statement, thereby violating his rights under the 5th and 14th Amendments to the United States Constitution. As such, Cellier asked the trial court to suppress the statements. After a full hearing on the motion, the trial court denied the motion, finding that Cellier "had the mental capacity to comprehend and appreciate the significance of the *Miranda* warnings." Cellier appeals this ruling.

Cellier did not object to the admission of his statements at trial based on the alleged improper waiver of his *Miranda* rights. In fact, Cellier welcomed the admission of the statements and used the bizarre content of the statements to support his insanity defense. "When . . . a motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal." *State v. Milo*, 249 Kan. at 18. Since Cellier did not object to the admission of the challenged evidence at trial, based on an

alleged improper waiver of *Miranda* rights, this issue has not been properly preserved for appeal.

## III. COMPETENCY TO STAND TRIAL

On June 3, 1994, Cellier filed a motion challenging his competency to stand trial, in accordance with K.S.A. 22-3302. Pursuant to this motion, Cellier was committed to Larned State Security Hospital. On October 12, 1994, the trial court held a hearing on the issue of Cellier's competency. At that hearing, two employees of Larned State Security Hospital testified. Harold Dixon is a registered master's level psychologist employed at Larned State Security Hospital since 1981. Dixon was the ward psychologist and treatment team leader for Cellier. Dixon gave Cellier numerous tests and utilized this information to help form his opinion regarding Cellier's competency to stand trial, *i.e.*, whether Cellier understood the courtroom proceedings against him and whether Cellier could help his attorney in preparing a legal defense. According to Dixon, Cellier suffered from schizophrenia, although it was in remission during Cellier's stay at the hospital. Dixon opined that as long as Cellier remained on medication and in a structured environment, his psychosis could be controlled. Dixon also stated that Cellier was impulsive, unreliable, irresponsible, exercised poor judgment, and could not concentrate. However, Dixon explained that he did not think that Cellier's impulsiveness, irresponsibility, or unreliability was relevant to his ability to help with his defense. Dixon concluded that Cellier was competent to stand trial.

Dr. Arsenio Imperial, a Larned psychiatrist, testified that he interviewed Cellier in order to evaluate his competency to stand trial. Imperial found that Cellier's memory for immediate recall, comprehension, and attention were impaired. Cellier told Imperial that he had spoken with his attorney about the defense of insanity. However, Cellier told Imperial that he did not feel he was criminally insane, but it was his attorney's idea to suggest it.

Imperial testified that a person who is delusional could still assist his or her counsel in creating a defense to a criminal prosecution if the individual was properly medicated and the delusions were well encapsulated. Imperial opined that Cellier's delusions were

encapsulated and controlled by medication to a point where he could appropriately assist his counsel with mounting a defense. Imperial gave his professional opinion that Cellier was competent to stand trial. Imperial stated that he had not observed anything during the court proceedings regarding Cellier's competency to suggest that Cellier was incompetent. Further, Imperial stated that if Cellier continued to take his medication as prescribed, there was no reason to believe he would not remain competent to stand trial.

Based on the testimony of Dixon and Imperial, the trial court ruled that Cellier was competent to stand trial. Cellier appeals this ruling.

The procedure and statutory requirements for determining competency to stand trial, etc., are contained in K.S.A. 22-3301 and K.S.A. 22-3302.

## A. Evidentiary Standard and Burden of Proof

Cellier's complaint is that these statutes do not include an evidentiary standard of proof which the trial court should use to determine whether the definition of incompetency has been met. As such, Cellier contends that there is no standard of proof by which to judge when the evidence is sufficient to find a person incompetent and no method to review a trial court's determination on appeal. Thus, Cellier challenges the competency statute as unconstitutional for failing to set out a standard of proof by which competency must be measured.

When a statute is challenged as unconstitutional, this court's standard of review is de novo. See *State v. Fierro*, 257 Kan. 639, 643, 895 P.2d 186 (1995).

In support of its position that K.S.A. 22-3302 is unconstitutional for failing to provide an evidentiary standard and burden of proof, Cellier points to two United States Supreme Court cases which addressed the constitutionality of competency statutes based on their evidentiary standards. *Cooper v. Oklahoma*, 517 U.S. 348, 134 L. Ed. 2d 498, 116 S. Ct. 1373 (1996); *Medina v. California*, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572, *reh. denied* 505 U.S. 1244 (1992).

In *Cooper*, the United States Supreme Court addressed an Oklahoma statute which presumed an accused was competant to stand trial unless the accused could prove his or her incompetency by clear and convincing evidence. The Supreme Court noted the well-accepted rule that " 'the criminal trial of an incompetent defendant violates due process.' " 517 U.S. at 354 (quoting *Medina*, 505 U.S. at 453). The Supreme Court then pointed out that with the Oklahoma statute, a criminal defendant could prove he or she was more likely than not incompetent (preponderance of the evidence standard), but if the defendant could not prove he or she was incompetent by clear and convincing evidence, then the defendant would still have to stand trial. Thus, the Court held that requiring the accused to meet such a high evidentiary standard of clear and convincing evidence, as opposed to a preponderance of the evidence standard, violated the accused's right to due process under the 14th Amendment. The Court struck down the Oklahoma competency statute as unconstitutional. 517 U.S. at 356, 369.

In *Medina*, the United States Supreme Court addressed a California statute which presumed an accused was competent to stand trial unless the accused could prove his or her incompetence by a preponderance of the evidence. The Court found that this statute, with its presumption of competence and preponderance of the evidence standard, did not violate due process. The Court upheld the statute as constitutional. 505 U.S. at 451-52.

Since an existing evidentiary standard in a competency statute can be too high and make the statute unconstitutional, Cellier asserts that the complete absence of an evidentiary standard in a competency statute should also make the statute unconstitutional. However, Cellier concedes that a court may salvage a statute when possible by interpreting ambiguous language in a constitutional manner.

Many states explicitly place the burden to prove incompetency on the defendant by a preponderance of the evidence. Several states place no burden on the defendant at all, but require the State to prove the defendant's competency once the issue has been credibly raised by the defendant. In a number of states, the burden

imposed on the defendant and/or the State to prove incompetency is unclear, as in Kansas. However, as the United States Supreme Court points out, "[n]othing in the competency statutes or case law of these States suggests . . . that the defendant bears the burden of proving incompetence by clear and convincing evidence." 134 L. Ed. 2d at 510 n. 17. Finally, the American Bar Association places the burden of proving incompetency on the party raising the issue, and the trial court must find the defendant is competent to stand trial "by the greater weight of the evidence." 2 ABA Standards for Criminal Justice § 7-4.8, p. 7-208 (2d ed. 1980).

The trial court obviously used an evidentiary standard to determine if Cellier could understand the proceedings or could assist in his defense. Neither K.S.A. 22-3301 nor 22-3302 explicitly provides such a standard. Thus, the trial court must have inferred an implicit evidentiary standard within the statutes from their language and the legislative intent. This has been done before and is not improper. For instance, K.S.A. 22-3215(4) provides the procedure for suppressing a confession. This statute specifically provides that the burden of proof for proving a confession is admissible is on the prosecution. However, the statute does not enunciate which evidentiary standard the prosecution must utilize to prove that a confession is admissible. This court did not find the statute was unconstitutional simply because it failed to enunciate a specific evidentiary standard for the State to use. Instead, this court inferred an evidentiary standard implicit within the statute—preponderance of the evidence. See *State v. Miles*, 233 Kan. 286, 295, 662 P.2d 1227 (1983). Thus, the trial court in this case can infer an evidentiary standard within the competency statute.

There are three different evidentiary standards which could be applied to K.S.A. 22-3301 and 22-3302—preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt. The latter two of these three standards have been found to violate due process when included in a competency statute. See *Cooper*, 517 U.S. 348. The legislature would not intend to promulgate an unconstitutional statute. If at all possible, statutes are to be interpreted in a constitutional manner. The only way to constitutionally interpret 22-3301 and 22-3302 is to find that their implicit evidentiary standard is a preponderance of the evidence standard.

The issue of competency to stand trial is more complicated than it appears, the reason being that the issue is frequently raised by the court itself as opposed to being raised by or on behalf of the accused or by the State. The obvious rule is that a party who raises the issue of competence to stand trial has the burden of going forward with the evidence, which will be measured by the preponderance of the evidence standard. When the court itself raises the competency issue, the court is not a party and cannot be responsible for coming forward with the evidence, but it can assign that burden to the State because both the court and the State have a duty to provide due process and to provide a fair trial to an accused. Determining the competency of an accused to stand trial is a duty that falls on both the State and the trial court. The trial court measures the evidence presented by the standard of preponderance of evidence. With a statutory presumption that an accused is sane, *State v. Gilder*, 223 Kan. 220, 227-28, 574 P.2d 196 (1977), it follows that there is a presumption a defendant is competent to stand trial. Using this implicit burden of proof and evidentiary standard within the competency statutes, we hold that K.S.A. 22-3201 and K.S.A. 22-3202 are not unconstitutional.

## B. Cellier's Competency to Stand Trial

Using the proper burden of proof and evidentiary standard, the trial court held a competency hearing and found that Cellier was competent to stand trial. Cellier appeals this finding.

A defendant is incompetent if the defendant cannot understand the court proceedings or assist counsel with a defense. K.S.A. 22-3301. According to Cellier, to be able to assist counsel, a defendant should have the ability to communicate rationally, to recall and relate facts concerning his actions, to comprehend advice, and to make decisions based on a well-explained alternative. See 2 ABA Standards for Criminal Justice § 7-4.1, Commentary, p. 7-173 (2d ed. 1980). Since Cellier does not have these abilities, he claims that he was incompetent to stand trial.

The only evidence presented at the competency hearing was the testimony of Drs. Dixon and Imperial, both of whom evaluated Cellier while he was a patient at the Larned State Security Hospital. Both Drs. Dixon and Imperial opined that Cellier could assist in his own defense. Both experts were medically trained to draw such conclusions. The trial court relied heavily on the testimony of these medical experts. The trial court also viewed Cellier in person at the competency hearing. From this evidence, the trial court ruled that Cellier was competent to stand trial. We find no error in this determination. This issue fails.

## IV. SUFFICIENCY OF THE EVIDENCE

At trial, Cellier relied solely on the defense of insanity. In Kansas, a defendant's insanity is determined by the *M'Naghten* test. Under the *M'Naghten* test, a defendant is considered insane and is not held criminally responsible for his or her acts (1) where the defendant does not know the nature and quality of the act, or, in the alternative, (2) where the defendant does not know right from wrong with respect to that act. *State v. Boan*, 235 Kan. 800, 809, 686 P.2d 160 (1984). The trial court instructed the jury on the *M'Naghten* test for insanity. The jurors found that Cellier was not insane. Cellier claims that the evidence was insufficient for the jury to find beyond a reasonable doubt that he was sane at the time of Payton's death or that he was guilty of premeditated murder and aggravated kidnapping.

In support of his insufficiency of evidence argument, Cellier contends that all of the evidence presented at trial established that he did not know the nature and quality of his acts and pointed to his insanity.

Cellier acknowledges that Dr. Lacoursiere testified Cellier was sane and that he understood the nature of his conduct. However, Cellier tries to discount Dr. Lacoursiere's testimony. For instance, Cellier points out that Lacoursiere only met with Cellier for 3¼ hours and this occurred approximately 1 year after the crime. The only other thing Lacoursiere did was listen to the tapes of the statements Cellier made on the day of the shooting and review Cellier's psychological documentation.

The taped confessions illustrate that Cellier conceived a plan to take Payton to a remote area in order to interrogate him after shooting him with a shotgun. Cellier planned to record Payton's "confession," and he had a tape recorder with him at the shooting for this purpose. However, Cellier told a friend he planned to shoot Payton in this manner, and Cellier's friend told him that such actions would result in death. This evidence demonstrates that Cellier knew what he was doing and realized shooting Payton was against the law.

When the sufficiency of the evidence is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Salcido-Corral*, 262 Kan. 392, Syl. ¶ 1, 940 P.2d 11 (1997).

Clearly, Cellier was suffering from delusions. However, he did plan to take Payton to a secluded area and shoot him. He was told beforehand that this would result in Payton's death. This indicates Cellier understood his actions. After Cellier shot Payton once, he saw Payton fall over and convulse. When Cellier saw Payton's eyes roll back in his head, he figured out that Payton was dying. Instead of seeking aid for Payton, Cellier shot Payton two more times. From the evidence, it appears Cellier made these shots with the intent to kill Payton quickly so he could hide the body. Cellier then attempted to put Payton's body in the trunk so he could hide it. This indicates that Payton knew what he did was illegal. When Cellier was unable to get Payton's body in the trunk, he drove to the sheriff's office and reported the shooting. Cellier lied to the sheriff's officers and told them a fabricated story about shooting Payton in self-defense. This also indicates that Cellier knew what he did was illegal and that he would be punished if the officers knew what actually had occurred. He made a plan and carried it out, including the purchase of a gun and ammunition and practicing firing the gun. The above evidence demonstrates that Cellier knew the nature and quality of his act and knew right from wrong with respect to that act. Thus, a rational juror could conclude be-

yond a reasonable doubt that the above evidence shows that Cellier was not insane when he shot Payton.

Reviewing all the evidence in the light most favorable to the State, we hold that a rational factfinder could have found Cellier sane at the time of the shooting and guilty beyond a reasonable doubt of premeditated murder and aggravated kidnapping. This issue fails.

Affirmed.