No. 77,073

STATE OF KANSAS, *Appellee*, v. GORDON R. BARNES, *Appellant*.

(948 P.2d 627)

Opinion filed November 7, 1997.

*Richard Ney*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Gordon R. Barnes killed J.R. Santo after luring him to an isolated area in Sedgwick County. He appeals his convictions for first-degree murder and aggravated kidnapping and the hard 40 sentence imposed. He claims the Kansas competence statute is unconstitutional and that the evidence fails to establish his competence. He also contends the trial court erred in its instructions and its consideration of evidence upon sentencing. We find no reversible error and affirm.

The body of 15-year old J.R. Santo was found by Sedgwick County Sheriff's officers buried underneath a 1956 Chevy in the defendant's yard. The defendant was charged with premeditated first-degree murder and aggravated kidnapping in connection with Santo's death.

The defendant met Santo through his sister, Angela Barnes. Santo and Angela had both received treatment at St. Francis Hospital's psychiatric ward in September 1993. Thereafter, Santo and Angela continued to correspond with each other and visit one another.

The defendant met Santo and Angela one evening while they were shopping at the Best Buy store. The defendant was angry at the time because his truck was not working. Santo mentioned that his neighbor had a truck that would be easy to steal because it was usually left unlocked. On November 29, 1994, the defendant, Santo, and Angela stole the truck. In return for his help, the defendant gave Santo $50.

The police questioned Santo the next day regarding the theft of the truck. Santo told police that he had spent the day with Angela and the defendant and knew nothing about the theft. Santo did tell police that the defendant worked as a mechanic for Coca-Cola in Wichita.

The stolen truck was recovered in the parking lot of the Coca-Cola plant. The license tag on the truck was registered to the defendant. Police questioned Santo again, and he told them about the theft. Charges were filed against the defendant and Santo.

According to Doug Anderson, a co-worker of the defendant at Coca-Cola, the defendant became upset that "some kid" was going to testify against him and that he would get jail time and be forced to pay restitution. Anderson stated that the defendant would frequently talk about his anger toward "this kid." In March or April 1995, the defendant asked Anderson how a person might go about "getting rid" of someone. Anderson believed that the defendant was joking at the time.

One night in mid-April, Anderson noticed that the defendant was working at the welding bench making a pair of axe heads. The defendant asked Anderson for some advice on attaching the heads to handles. According to Anderson, when the defendant finished making the axe heads, he painted them black and decorated the heads. Anderson did not find this activity unusual, as the defendant collected swords and other weapons.

Another friend of the defendant, Kristy Wilson, testified that the defendant contacted her on April 29. He told her that he needed her help to "get rid" of a person who would be testifying against him in a truck theft. Wilson testified that she asked the defendant what he meant by "get rid" of the person. The defendant told her that he was going to kill the person and needed her to drive the car. Wilson asked the defendant if he really needed to kill the person, and the defendant stated that it was "the only way." She agreed to help. Wilson did not really believe that the defendant would kill Santo and thought that the defendant might only beat Santo.

The next night, Wilson called the defendant. The defendant asked her if she had a shovel that he could borrow but she said that she could not get it out of her house without being noticed. She picked the defendant up at his house. Again, she asked him if there was not some other way besides killing Santo; he again stated that killing Santo was "the only way."

The defendant explained to Wilson that Angela was to call Santo and tell him that she and Wilson were picking him up to go smoke marijuana out in the country. The defendant told Wilson that he would kill Santo, put the body in the trunk, and then dump the body out in the country. Before leaving to pick up Angela, the defendant put some trash bags in the trunk and took out the trunk light. The defendant also put a knife and an axe in the trunk.

Wilson testified that they picked up Angela at a friend's house. During this time, the defendant decided that he would hide in the trunk when they went to pick up Santo so that Santo would not know he was present.

The group drove to Santo's house, stopping a few blocks away so that the defendant could get in the trunk. Santo got into the car. Angela told Santo that they were going to a party but that first they would go out into the country and smoke some marijuana because she did not have enough to share with the people at the party. Wilson then drove out into the country and stopped at a location in Sedgwick County. The group got out of the car and began to smoke marijuana from a tomahawk-shaped pipe. Wilson told Santo that she was going to go back to the trunk to look for

some more marijuana. Wilson opened the trunk, left it partially open, and returned to the front of the car where Santo and Angela were smoking marijuana.

Approximately 5 minutes later, the defendant got out of the trunk and walked toward the group. He was dressed in a black shirt with a hood and black jeans. According to Wilson, the defendant walked up to Santo and stated in a monotone "[H]ey, J.R., how are you doing." At this point, Angela yelled for Wilson to run, and both Wilson and Angela ran. Wilson testified that as she looked back, she saw the defendant raise his arm and strike Santo. She heard a "thump" and then heard Santo scream, "No," "Please don't," and "Help." Wilson put her hands over her ears because she did not want to hear anything else.

After a short time, Wilson and Angela decided to go back to the car. They did not see the defendant or Santo. Wilson started the car and then saw the defendant near a line of trees. She then saw another car coming up the road toward them. The defendant yelled for them to drive past the oncoming car and turn around while he hid in the trees. They did so.

When Wilson and Angela returned to the place where the attack had occurred, the defendant dragged Santo's body from behind some trees. Wilson opened the trunk of the car, and she and the defendant placed Santo inside. Wilson testified that she heard Santo make a "gurgling" noise while she was helping to put him in the trunk.

The defendant directed Wilson to drive to an area near 87th Street in Wichita. At 87th and Bluff, they found the street blocked by a locked gate. The defendant got out and tried to open the gate but was unsuccessful. He then told Wilson to take the body back to his house.

Wilson realized that to get to the defendant's house, they would have to drive down Broadway Street, and she was very nervous that they might get stopped. The defendant told Wilson and Angela that if they were stopped they should tell the police that he had threatened them and made them go along in the killing. Before turning onto Broadway, Wilson stopped the car and checked the outside for blood.

The group arrived at the defendant's house, and the defendant took Santo's body out of the trunk. The defendant told Wilson that he was going to burn the shirt he had been wearing, and she gave him the gloves that she had been wearing to burn. The defendant then went outside to wash the car. The defendant washed the trunk out with a hose and then drove to a car wash and washed off the outside. Wilson then went home.

The next day, Brian McGilvray, another friend of the defendant, went over to the defendant's house. When McGilvray arrived, the defendant told him that some strange things had been occurring inside the house, such as candles flickering on and off, but that the activity had stopped with McGilvray's arrival. While he was there, the defendant told him that the defendant had "had to take care of somebody" and was disturbed by it. The defendant told Mc-Gilvray that he hit a person on the head with a tomahawk, that he stabbed the person with a knife, and that the person did not fight back. The defendant showed McGilvray where he had buried the body in the back yard.

Two days after the murder, when the defendant showed up for work, Doug Anderson noted that the defendant's face looked swollen, as if he been in a fight. That week was the defendant's scheduled court appearance on the stolen truck case, at which he plead no contest to theft and criminal damage to property charges. The defendant indicated to Anderson that the proceedings had gone well and the witness who was going to testify against him had not shown up. Later, the defendant told Anderson that the reason the witness did not show up was because he had used his sister to lure the witness into the country, and he had killed the witness with an axe. Anderson testified that the defendant told him that the body was making "gurgling" noises as the defendant was putting it in the trunk of the car. Anderson also testified that, after this incident, whenever the defendant would get angry at work, the defendant would mutter that he would like to "dig [Santo] up" and use his head for a basketball or soccer ball.

Isaac Ibarra, another friend of the defendant, stated that he was riding in a car with the defendant in May when the defendant suddenly slowed the car down and asked Ibarra if he had seen

people in the road. Ibarra saw no one in the road. Later, the defendant showed Ibarra a pair of axes and stated he was ready for the spirits to come after him. The defendant told Ibarra that he had killed someone and the spirit of the dead person would be coming after him. Ibarra indicated that the defendant began wearing two axes on a string around his neck.

The defendant was questioned on two occasions by law enforcement officers. During the second interrogation, he confessed to killing Santo and burying him 6 feet deep under the 1956 Chevy. Acting on this information, officers were able to recover Santo's body.

The defendant was charged with first-degree premeditated murder and aggravated kidnapping. The State filed a notice that it would be seeking the hard 40 sentence for the first-degree murder charge. Prior to trial, the defendant filed a notice that he would be asserting an insanity defense. The defendant also filed a notice of incompetency to stand trial and a motion to strike competency proceedings as unconstitutional. The defendant argued that K.S.A. 22-3302 violated his right to due process in that it did not set out an evidentiary standard to be used in competency proceedings.

A hearing on the defendant's competency was held on December 22, 1995. Before presenting any evidence, the defense counsel raised an issue regarding which party had the burden of proof. The court took the motion under advisement.

The State called Dr. Wayne Anderson, the Chief Psychologist for the Sedgwick County Department of Mental Health. Dr. Anderson testified that he had been asked to examine the defendant pursuant to a court order to determine competency. He stated that the defendant was brought to the examination area, at which time the defendant expressed reluctance to participate in the evaluation without first talking to his attorney. Dr. Anderson asked to have the defendant's attorney contacted. Twenty minutes later, he received word that the defendant's attorney would not be available for approximately one-half hour. Because the defendant did not want to have the examination without his attorney, the examination was canceled. Dr. Anderson testified that the defendant was polite, seemed calm, spoke in a clear manner, and responded logically.

Dr. Anderson stated that he then had another opportunity to interview the defendant the day before the hearing. However, the defendant still did not wish to participate in the evaluation. Dr. Anderson stated that he found the defendant able to communicate in a normal manner and with logical speech. Dr. Anderson testified that as a result of the defendant's refusal to take the evaluation, he was unable to render a professional opinion as to competency.

Dr. Samuel Harrell, a licensed clinical psychologist, testified on behalf of the defendant. Dr. Harrell had interviewed the defendant for approximately 12 hours and had administered a battery of tests. According to Dr. Harrell, the tests indicated that the defendant was suffering with schizophrenia of the paranoid type, depressive disorder, and post-traumatic stress disorder with delayed onset. Dr. Harrell felt that the defendant was also suffering dementia from a possible childhood head trauma.

In Dr. Harrell's opinion, the defendant was not competent to stand trial. Dr. Harrell testified that the defendant was preoccupied with delusions and would not be able to testify in a rational manner or assist in his defense. Dr. Harrell felt that the defendant might possibly feel paranoid and believe his attorney to be against him and as a result might withhold information from his attorney. Further, Dr. Harrell was of the opinion that the defendant's borderline mental retardation would make it difficult for him to understand the courtroom proceedings.

Dr. Harrell stated that he questioned the defendant with regard to his understanding of court proceedings. The defendant stated that "the jury decides whether you live or die or just put[s] you away" and that the jury tells the judge its decision. According to Dr. Harrell, the defendant did not know the function of the judge but did know that his lawyer was to try to help him out as much as he could and "tell good things about him."

Dr. Harrell admitted on cross-examination that the defendant did understand the role of the defense attorney and the basic operation of the court. Further, the defendant took a test in which he filled in incomplete sentences wherein he stated that his greatest worry is "being in prison for the rest of my life." In another

exercise, the defendant stated that he regrets "making bad decisions" and the only trouble he has is "making the right decisions."

Dr. Harrell also admitted that the defendant's co-workers found him a fun person to be around and that he was able to competently perform his job as a mechanic. However, on redirect, Dr. Harrell noted that, according to his testing, the defendant loses 52% of his memory of things people have said to him within 30 minutes. According to Dr. Harrell, the normal person retains 90-100% of this auditory memory after 30 minutes. Dr. Harrell felt that this problem with auditory memory could affect his ability to relate to counsel and plan strategies.

The State called Officer John Schilling in rebuttal. Officer Schilling testified that he was the detention deputy at the Sedgwick County Jail where the defendant was confined. According to Schilling, the defendant had no trouble following instructions at the jail and did not exhibit any behavior out of the ordinary. Schilling admitted, however, that the most complicated instructions he had given the defendant were to return to his room and shut the door.

Dr. Harrell testified in surrebuttal that the defendant's ability to follow jail rules has no bearing on the ability to stand trial. He did admit that his testing demonstrated that the defendant had an appreciation and understanding of his actions and the consequences of his actions.

At the conclusion of the presentation of evidence, the court determined that there was no actual burden of proof under K.S.A. 22-3302, that competence was a question for the court based on the evidence presented, and further that the defendant was competent to stand trial. The court found the testing demonstrated that the defendant understood the charges against him and the potential penalties as well as the purpose of the proceedings and the role of his attorney. The court also noted that the defendant appeared to be cooperating well with his attorney.

On January 22, 1996, the day of trial, defense counsel informed the court of a need to reopen the competency hearing. Defense counsel told the court that he had discussed the case with the defendant that morning and the defendant was having trouble understanding the nature of the proceedings. According to defense

counsel, the defendant recalled the judge's name and that the judge ran the courtroom but did not know why a judge was necessary if there was to be a jury. The defendant understood that the prosecution would tell its story and stated that the prosecution would try to "put some time on him." He understood that his defense counsel would be raising insanity and self-defense issues but could not recall the facts that would establish those defenses. The court agreed to hear further evidence on competency.

The defense called Dr. Harrell, who testified that he had again examined the defendant. According to Dr. Harrell, the defendant was having problems with things said in the courtroom. Dr. Harrell stated that the defendant told him that the judge was making statements that the defendant could not understand, that the prosecutor was taking information and turning it against him, and that the defendant knew the defense attorney was there to help him but could not explain why.

Dr. Harrell testified that the defendant's thought process was becoming fragmented and delusional and that he was evasive when answering questions. The defendant would sometimes engage in non-purposeful behavior like waving a pencil around in the middle of the tests. Dr. Harrell was of the strong opinion that the defendant was not "malingering" or manufacturing his symptoms. He did admit on cross-examination that the defendant was responsive to all of the tests.

Dr. William LeVine, a psychiatrist, then testified. Dr. LeVine stated that he had interviewed the defendant at the request of the State on January 5 and January 17. During these interviews, he spoke with the defendant about the legal process. According to Dr. LeVine, the defendant knew he was charged with murder, who his lawyer was, and that the lawyer was paid to defend him. Further, the defendant knew that the prosecutor would be fighting against him and that he was not going to be released no matter what the result of the trial. Dr. LeVine testified that the defendant knew he could be sentenced to serve 40 years in prison without parole.

Dr. LeVine testified that the defendant told him that when he was in the courtroom things made no sense to him. However, Dr. LeVine noted that the defendant was cooperative and answered

questions in a coherent manner. Dr. LeVine stated that the defendant meets many of the factors that suggest malingering, including: (1) motive to malinger; (2) presence of an antisocial personality disorder; (3) sudden purported emergence of psychotic symptoms to explain antisocial behavior; (4) symptoms which arise in the context of a legal proceeding; (5) lack of objective corroboration of symptoms before the crime occurred; (6) inconsistency of information from different sources or from the same source at different times; and (7) weak conformance with known patterns of psychiatric disorders. In Dr. LeVine's professional opinion, the defendant was competent to stand trial. He noted that in his conversations with the defendant, he saw no evidence of thought disorder or paranoid delusions and found that the defendant could remember the conversation from one visit to the next and understood generally the role of various components of the legal process.

On cross-examination, Dr. LeVine admitted that he spoke to the defendant for 90 minutes on January 5 and 30 minutes on January 17 and conducted no actual testing during this time period, although he did review the reports of the testing done on the defendant.

The trial court concluded that the defendant was competent to stand trial. The court indicated that it felt the defendant was malingering and ordered the case to proceed to trial.

The defendant testified on his own behalf. He admitted that he participated in stealing the truck although he stated that it was Santo's idea. The defendant also testified that Santo sent him a letter asking him to burglarize the house of one of Santo's parents and split the money with Santo, but that he declined. The defendant indicated that trouble between himself and Santo began following their arrest for stealing the truck. According to the defendant, Santo wanted the defendant to clear him of wrongdoing. The defendant refused, and Santo threatened to have someone rape and disfigure the defendant's sister.

The defendant testified that he began hearing voices after a friend of his had accidentally shot himself when they were both playing with a gun in the woods. He stated that a voice began telling him to kill Santo after Santo threatened his sister. He identified

the voice as the voice of his late grandmother, who had ordered him to protect his sister. The defendant testified that after Santo threatened his sister, he was afraid to let her be alone for fear that she would be harmed.

The defendant stated that when the group went out in the country he was not going to kill Santo. Instead, he was going to severely beat Santo so that Santo would stay away from his sister. When he got out of the trunk, he noticed that Santo was holding a tomahawk-shaped peace pipe, and he knocked it out of Santo's hand with his axe. He then hit Santo over the head with the axe and they struggled. He knocked Santo into a ditch and began slapping him around, stating, "[W]hat are you going to do now?" Then, according to the defendant, he "just kind of lost it," pulled out a knife he was carrying, and stabbed Santo.

The defendant also testified that he thought Santo would be coming back to life. He buried the body in the back yard so that he could keep watch on it.

Other testimony introduced on behalf of the defendant included evidence of severe childhood abuse suffered by the defendant at the hands of his mother and maternal grandmother prior to his adoption by his current family. A former stepfather of the defendant, the defendant's maternal aunt, the defendant's babysitter, and the defendant's sister all testified that the defendant suffered horribly at the hands of his mother and grandmother, who were both severely mentally ill.

At the instructions conference, the defense asked that the jury be instructed on self-defense. The court declined to give the instruction.

The defendant was convicted of premeditated first-degree murder and aggravated kidnapping. His sentencing hearing was held on April 16, 1996.

At the hearing, the State decided to rest its evidence regarding imposition of the hard 40 sentence on the evidence presented at trial. The defense presented the testimony of Mary Hudson Goode, a mitigation specialist. Goode testified at length regarding the defendant's family history, relating evidence showing how the defendant had been abused prior to being adopted by his current par-

ents. She testified in great detail about the problems for the defendant caused by the mental illness suffered by his mother and maternal grandmother.

The defense also offered several notebooks of evidence regarding the defendant's social and psychological history. At closing arguments, defense counsel urged the court to adjourn and review the information in detail. The court stated:

"Back at the time there was an issue regarding admissibility in front of the jury, I did get an opportunity to scan those. That's the best I can describe it, is scanning those, because literally if I were to read every document that was in there, I would probably have to recess this hearing for a month and block out the entire working hours for the next month to read those documents."

Defense counsel indicated that this procedure was exactly what he was suggesting. The court then stated that it had previously reviewed the information in the notebooks during the trial and that much of the information contained in them was not relevant. The court stated, however, that it would be glad to review any specific items the defendant wished to present.

Defense counsel responded that he could not pull out any one document and designate it as more significant than others. The court then agreed to review the documents over lunch hour.

The defendant was sentenced to the hard 40 on the premeditated first-degree murder charge and 178 months for the aggravated kidnapping charge, to run consecutively. His appeal follows.

Before addressing the issues raised by the defendant, we note that his appeal is untimely. The defendant's sentence was pronounced on April 16, 1996, and his notice of appeal was not filed until May 1, 1996, 15 days later. A criminal defendant has only 10 days from the date sentence is pronounced in which to appeal. K.S.A. 22-3608(c). Ordinarily, this court does not have jurisdiction to entertain an appeal in a criminal case where the notice of appeal is untimely. *State v. Ortiz*, 230 Kan. 733, 736, 640 P.2d 1255 (1982). However, an exception exists where the defendant was furnished an attorney for the purpose of filing a notice of appeal and the attorney failed to perfect and complete the appeal. *State v. Shortey*, 256 Kan. 166, 168, 884 P.2d 426 (1994). The defendant

falls within the exception, and our jurisdiction vests under K.S.A. 22-3608(c).

## Constitutionality Of K.S.A. 22-3302;
## Determination Of Competency To Stand Trial

The defendant contends that the procedure for determining whether a criminal defendant is competent to stand trial under K.S.A. 22-3301 and K.S.A. 22-3302 is unconstitutional. He argues that K.S.A. 22-3302 fails to provide for an appropriate evidentiary standard and is, therefore, unconstitutionally vague. He also argues that the same statute denies him due process of law by failing to provide him an adequate hearing.

In regard to the defendant's first contention, we have recently addressed this issue. In *State v. Cellier*, 263 Kan. 54, 948 P.2d 616 (1997), we held that K.S.A. 22-3301 and K.S.A. 22-3302 were not unconstitutional. We found that K.S.A. 33-3302 implicitly contains a standard of proof of preponderance of the evidence with the burden of proof imposed on the party raising the competency issue. 263 Kan. at 69-70. We further held that there is a presumption that the defendant is competent to stand trial. 263 Kan. at 70.

The district court adopted the appropriate standard of preponderance of evidence in its determination that the defendant was competent to stand trial. While the district court did not have the benefit of the *Cellier* holding regarding burden of proof, it did not require the defendant to assume the burden of proof and based its decision upon all evidence presented. Our holding in *Cellier* is dispositive of the defendant's first argument.

The defendant also contends that K.S.A. 22-3302 fails to honor an accused's right to a meaningful hearing in that it does not require the district court to appoint a psychologist to evaluate the capacity of the defendant, nor does it require an adversarial hearing. The defendant suggests that the absence of these requirements makes the statute unconstitutional.

However, the defendant fails to present any authority holding that an adversarial hearing is required. In *Medina v. California*, 505 U.S. 437, 451, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992), the Supreme Court held that the standard for assessing whether a

State's procedure for determining competency comports with due process is whether the procedure "affords the criminal defendant on whose behalf the plea of incompetence is asserted a reasonable opportunity to demonstrate that he is not competent to stand trial." The Due Process Clause does not require a state to adopt one procedure over another on the basis that it may produce results more favorable to the accused. 505 U.S. at 451.

The framework provided by K.S.A. 22-3302 gives the defendant ample opportunity to so demonstrate. It allows the defendant or his counsel to raise the issue and requires a hearing at which time the defendant is allowed to present evidence to establish his incompetence. The fact that the hearing may not afford the defendant the opportunity to cross-examine court-appointed physicians does not detract from his opportunity to demonstrate his incompetence. We conclude that K.S.A. 22-3302 provides a defendant with a procedure which is adequate to protect his right not to be tried while incompetent. Therefore, it is not unconstitutional.

### Did The District Court Err In Determining That The Defendant Was Competent To Stand Trial?

The defendant contends that the evidence demonstrated his incompetence and the district court abused its discretion in finding him competent to stand trial. A criminal defendant is incompetent to stand trial when, because of a mental illness or defect, the defendant is unable to understand the nature and purpose of the proceedings against him or her or where he or she is unable to make or assist in making a defense. K.S.A. 22-3301. On appeal, a reviewing court's inquiry regarding the decision of a district court that a defendant is competent to stand trial is whether the trial court abused its discretion. *State v. Peckham*, 255 Kan. 310, 325, 875 P.2d 257 (1994). Judicial discretion is abused where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. O'Neal*, 256 Kan. 909, 911, 889 P.2d 128 (1995).

In this case, the district court held a hearing from December 22, 1995, to January 2, 1996, and continued that hearing to permit new evidence on January 22, 1996. During these competency hearings, the defense's witness, Dr. Harrell, testified that the defendant was suffering from schizophrenia of the paranoid type, depressive disorder, and post-traumatic stress disorder with delayed onset, as well as dementia from a possible childhood head trauma. In Dr. Harrell's opinion, the defendant was not competent to stand trial because he was preoccupied with delusions and would not be able to testify in a rational manner or assist in his defense. Dr. Harrell felt that the defendant might possibly feel paranoid and believe his attorney to be against him and, as a result, might withhold information from his attorney. Further, Dr. Harrell felt that the defendant's borderline mental retardation would make it difficult for him to understand the courtroom proceedings.

However, when Dr. Harrell questioned the defendant with regard to his understanding of court proceedings, the defendant was able to relate the functions of many of the participants in the courtroom, including the function of the defense attorney.

Although Dr. Anderson was unable to render a professional opinion because the defendant refused to allow himself to be evaluated without counsel present, he testified that he was able to speak to the defendant and that the defendant was able to communicate in a normal manner and the defendant's speech was logical. Dr. William LeVine, who was able to interview the defendant, testified that the defendant understood the legal process and was able to cooperate and answer questions in a coherent manner. In Dr. LeVine's professional opinion, the defendant was competent to stand trial.

It is undeniable that the defendant has some mental problems. However, there is conflicting evidence on the question whether these problems would render him incompetent to stand trial. Both expert witnesses who testified indicated that the defendant had comprehension of the roles of the various participants in the trial and understood the crimes with which he was faced, as well as the possible ramifications of conviction of those crimes. As for his ability to help with his defense, the evidence indicated that the defen-

dant was able to respond appropriately in court and cooperate with his attorney to the extent that the defendant refused to be examined by Dr. Anderson without his attorney present. Although Dr. Harrell testified that the defendant's alleged paranoia might cause him to fail to cooperate with his defense attorney, this was mere speculation, and there was no indication that such paranoia surfaced during trial.

The testimony regarding the defendant's memory retention ability is an area of concern. However, although Dr. Harrell testified that the defendant was woefully deficient in this area, Dr. LeVine testified that he saw no problems with the defendant's ability to recall recent events. Dr. LeVine also testified that the defendant met many of the factors which would at least indicate the defendant might be malingering.

Based on these factors, the district court's determination that the defendant was competent to stand trial was not one with which no reasonable person would agree. Under our standard of review, we conclude that the district court did not abuse its discretion.

## Did The District Court Err In Refusing To Instruct On Self-Defense?

The defendant argues that the district court erred in failing to instruct the jury on self-defense. He contends that there was evidence which would establish that he believed that force was necessary in order to defend himself from Santo. We disagree.

In a criminal action, the district court must instruct the jury on the law applicable to defendant's theories for which there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. See *State v. Hernandez*, 253 Kan. 705, 706, 861 P.2d 814 (1993). A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. *State v. Shortey*, 256 Kan. at 172.

In order to justify the giving of a self-defense instruction, the evidence must include some evidence to support each prong of a

two-prong self-defense test. The first prong is subjective and requires a showing that the defendant sincerely and honestly believed it was necessary to kill to defend himself. The second prong is an objective standard and requires a showing that a reasonable person in the defendant's circumstances would have perceived self-defense as necessary. *State v. Tyler*, 251 Kan. 616, 625, 840 P.2d 413 (1992).

The defendant contends that there was evidence which would establish that he was engaged in mutual combat with Santo and that killing Santo was necessary to defend himself. He is wrong. The evidence in this case, including the defendant's testimony, indicates that the defendant walked up to Santo and initiated the conflict by hitting Santo in the arm and head with his axe. Although he now argues on appeal that Santo was holding a tomahawk-headed smoking pipe at the time, there is no indication whatsoever that the defendant felt threatened by Santo at the time of the killing. Even if what happened after the defendant struck Santo could be characterized as mutual combat, an instruction would still not be necessary. The doctrine of self-defense cannot be invoked to excuse a killing done in mutual combat willingly entered into. *State v. Gayden*, 259 Kan. 69, 82, 910 P.2d 826 (1996). One willingly entering into a mutual combat is not justified or excused in taking life unless he or she has withdrawn in good faith and done all in his or her power to avert the necessity of killing. 259 Kan. at 82.

There is simply no evidence which would allow a jury to determine that the defendant acted in self-defense in this case. The defendant's own testimony establishes that he struck Santo with an axe; fought with him, rendering Santo helpless; and then stabbed him numerous times with a knife. Although the defendant now claims that he acted only to disarm Santo and then was forced to defend himself when Santo attempted to grab his axe, this argument is contradicted by the testimony at trial. In describing his actions, the defendant stated, "For some reason, I kind of pulled out [my axe], knocked [the pipe] out of his hand, *hit him in the head.* That's when we started struggling." Finally, the only evidence of the killing shows that the defendant had Santo at his mercy, and then drew his knife and began stabbing him.

## Did The District Court Fail To Consider Mitigation Evidence At Sentencing?

The defendant's final argument is that the district court failed to consider mitigation evidence contained in several notebooks submitted to the court at the sentencing hearing. The defendant contends that the court's failure to read each and every one of the exhibits presented deprived him of his due process rights and requires that he be resentenced.

K.S.A. 21-4635(b) provides that, in order to make a determination of whether to impose the hard 40,

"the court may be presented evidence concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4636 and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."

The defendant argues that the court refused to read the exhibits he presented in mitigation. From the tenor of the defendant's brief, one might assume that the court absolutely refused to read any of the information submitted and that this was the only information presented in mitigation. Such is not the case, as a reading of the record reveals.

In addition to the information contained in the notebooks, the defense presented the testimony of mitigation specialist Mary Hudson Goode, who testified at length regarding the defendant's family history, including the defendant's abuse prior to being adopted by his current parents and the defendant's problems with the mental illness suffered by his mother and maternal grandmother.

With regard to the notebooks of evidence regarding the defendant's social and psychological history, the district court judge agreed to review the notebooks, but not to read them word for word, stating:

"Well, I can't feature that I really need to read them. I did scan them, because I glanced through—I went through in detail and logged one entire volume so I had an idea of the nature of the documents that were in there; and it includes

things like grade cards of Angela's, things that just couldn't possibly relate to the issue that is before the Court here this afternoon.

"But I know there are other items other than that in these documents. But, by scanning the rest of the notebooks, I have a flavor for what is in there and realize certainly I have had those at my disposal since the time of trial. They have been available that I could review them, but I have to say I have not had additional reviewing of them other than what I had during the trial, because I think that from my review at the time I could not see anything that needed more than the three and a half week trial that the Court already has been through, because I know a lot of that same information contained in the documentary form inside those exhibits has already been presented in the form of live witnesses in the courtroom. So, I can't see that adding on to that would be of great value.

"If you want to single out individual documents out of there for me to review, I will be glad to do that. If you think there's some things that go specifically to the issue of mitigation or aggravation that I have not otherwise heard any evidence on that would relate to that, I will be glad to review those particular items. But, everything I was seeing in there was a duplication of what the witnesses were testifying about or they were so far out on the way of relevancy—as an example, Angela's grade cards, I couldn't see how they would have a bearing on aggravating and mitigating circumstances.

"So, under one of those two theories I don't see a reason for me to review every one of those documents, but I certainly will give you the opportunity if you want to single out specific documents that you think especially go to aggravating or mitigating circumstances that have not otherwise been presented by live testimony."

Defense counsel answered that he could not pull out any one document and designate it as more significant than others. The court then agreed to review the documents over lunch hour and did so.

In support of his argument that this action by the district court violated his rights, the defendant cites *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). In *Eddings*, the Supreme Court found that it was error for the district court to refuse to consider, as a matter of law, relevant mitigating evidence. 455 U.S. at 113-14. However, *Eddings* is not applicable to the situation in this case, where the district court did not as a matter of law refuse to consider relevant mitigating evidence.

Instead, it is clear that the district court considered the evidence presented by the defendant in mitigation of punishment that it deemed relevant. Under K.S.A. 21-4635, the court has the discre-

tion to admit and consider such evidence as it finds relevant. The court allowed the defendant to present evidence through a mitigation specialist and also admitted and reviewed supporting documents, which the court had previously seen in the trial. Further, the court considered evidence from the trial regarding the same events depicted in the notebooks which the defendant urged the court to consider. Finally, the court informed the defendant that while it would not read every item contained in every one of the notebooks, it would certainly consider any individual items that the defendant might designate.

The evidence in question was admitted into evidence by the district court. Contrary to the defendant's contention, the court considered all evidence deemed relevant under the provisions of K.S.A. 21-4635. The court gave the defendant the opportunity to specify what documents within the eight notebooks that the defendant wished the court to consider. The defendant failed to avail himself of this opportunity, insisting that every document be considered. Under the circumstances, we conclude that the court considered the evidence. We further conclude that it is the trial court's prerogative to determine relevancy. In this case, the defendant has demonstrated no abuse of discretion in the trial court's consideration of the relevant evidence regarding sentencing.

Affirmed.