No. 94,589

STATE OF KANSAS, *Appellee*, v. NATHANIEL L. HILL, *Appellant*.

(228 P.3d 1027)

■■■■■■■■■■■■■■■■■■■

■■■■■

■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

Opinion filed April 15, 2010. ■■■■■■■

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, argued the cause, and was on the brief for appellant.

*Kristafer R. Ailslieger*, assistant solicitor general, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Nathaniel L. Hill stands convicted of capital murder, possession of marijuana with intent to sell, possession of drug paraphernalia, and failure to purchase a drug tax stamp. This is his direct appeal from these convictions.

Hill raises five issues: (1) Whether his jury should have been instructed on heat-of-passion voluntary manslaughter; (2) whether the prosecution advanced sufficient reasons for its peremptory strike of an African-American venire member; (3) whether a certain photograph should have been admitted into evidence; (4) whether adequate foundation was laid for admission of an incriminating note purportedly written by Hill; and (5) whether the district judge erred in handling the issue of Hill's competence to stand trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Police found the bodies of April Milholland and her boyfriend, Sam Yanofsky, dead inside a car that had collided with a tree in Independence, Kansas. Milholland's body, wrapped in a black plastic trash bag, was in the backseat of the car. Yanofsky's body, covered with a bedspread, was in the car's trunk.

The investigation of the murders quickly led to defendant Nathaniel Hill, an Independence drug dealer who supplied Yanofsky with drugs, which Yanofsky then resold. Independence Police Department Detective Harry Smith interviewed Hill. Hill admitted that he knew Yanofsky and Milholland, that he had last spoken to them on the phone the previous evening, and that Yanofsky owed him $2,000 for marijuana. Hill denied any involvement in the mur-

ders and suggested to police that Yanofsky's half-brother, Nate Castorena, might have been responsible.

The next day, police approached Hill outside of Jose Castorena's house. Hill got out of his car and allowed the officers to search it. During the search, officers found a block of marijuana, a set of scales, and a pipe. Police arrested Hill, and Smith again interviewed him about the murders. Hill again denied involvement and again suggested Nate Castorena as the likely murderer.

After obtaining additional information from Hill's girlfriend, Collette Dunn, Smith interviewed Hill a third time, 2 days after Hill's arrest. In this interview, Hill gave several versions of what had happened the night Milholland and Yanofsky were killed.

In the first version, Hill blamed the murders on the "Mexican Mafia," claiming its members had fronted him $2,000 worth of marijuana he had, in turn, fronted to Yanofsky. Hill claimed Mexican Mafia members shot Yanofsky and Milholland while holding Hill at gunpoint and then carried the bodies out to the car in which they were found, Milholland in the back seat and Yanofsky in the trunk. One of the Mexican Mafia members then drove the car into a tree while Hill rode in a vehicle that followed. Hill told Smith that the Mexican Mafia members then dropped him off at a church and told him to run.

Smith challenged this first version of events and pressed Hill for the truth. Hill then offered his second version.

In the second version, Hill called Milholland and asked her and Yanofsky for his money. Yanofsky told Hill that he had the money and agreed to bring it to Sylvester Jones' house. When Yanofsky later showed up at Jones' house without the money, Hill became angry. Hill and Yanofsky started wrestling, and Jones shot Yanofsky. Jones then took Milholland to a back bedroom and shot her while Hill was cleaning up Yanofsky's blood. Hill said he and Jones then carried the bodies out to the car. Jones drove the car and jumped out of it as it headed for the tree.

Hill then told a third version of his story.

In the third version, Hill shot Yanofsky accidentally as he and Yanofsky wrestled on the bathroom floor. Yanofsky and Milholland had gotten drunk and "coked out" after arriving at Jones' house.

Yanofsky rushed Hill in a drunken, jealous rage, after Milholland said "some stupid shit." Because Yanofsky was strangling Hill, Jones slid a gun to Hill. Hill picked up the gun and it accidentally went off when Yanofsky hit Hill's hand.

Detective Smith interviewed Jones the day after the third interview of Hill. Jones described himself and Hill as life-long friends. In exchange for Hill providing Jones with free marijuana, Jones allowed Hill to store his drugs and gun at Jones' house. Hill and Jones had been hanging out together most of the night of the murders. They were smoking marijuana and Jones was drinking. Hill left Jones' home about 3 a.m. and Jones went to bed. He awoke later when he heard Hill in his house, talking to someone. Hill then came into his bedroom, got something off of the nightstand, and told him to go back to sleep. The nightstand was where Hill kept his gun and marijuana. A few minutes later, Jones heard a gunshot. He then heard Milholland running through the house and screaming, "Why did you do that?" Jones then heard Hill say, "Strip." Five to ten minutes later, Jones heard a second gunshot.

Jones said that Hill then came into his bedroom and told him to help clean up the mess from the shootings. Hill still had the gun in his hand. Jones walked out into the hallway and saw Yanofsky in the bathroom, his head over the tub. Yanofsky was making a snoring sound.

Hill told Jones to get some trash bags and put one over Yanofsky's head, which Jones did. Hill told Jones to pull Yanofsky out of the bathroom. Jones refused to touch Yanofsky. Hill pulled Yanofsky onto a blanket, telling Jones that, if he did not help, Hill would leave Yanofsky at the house and Jones would end up being blamed for the crime. At Hill's direction, Jones helped Hill pick up Yanofsky, carry him to the car, and put him into the trunk. Yanofsky was making noises as they put him into the trunk. Hill then closed the trunk lid.

Hill and Jones then went back into the house, specifically the back bedroom. There Jones saw Milholland lying on the floor. Hill put a trash bag over Milholland and rolled her body onto a comforter he had gotten from the laundry room. He and Jones

then carried Milholland to the car. Hill got into the backseat and pulled Milholland in after him.

Hill and Jones then went back into the house and cleaned. At about 6 a.m., Hill drove away in the car. Jones continued cleaning. He moved his bed into the back bedroom and placed it over a stain on the carpet. Jones put the towels used to clean into a broken dryer in the laundry room. He also hid a set of digital scales that had been in the bathroom inside the dryer. He put Hill's gun and Hill's marijuana in a hallway closet.

Jones later used a box cutter Hill brought over to cut the stained piece out of carpet in the back bedroom. He also hid the stained piece of carpet in the dryer.

In a later search of Jones' house, officers found a bag of marijuana and a .45 caliber handgun in a hallway closet. In the back bedroom, officers found box springs on the floor, under which a piece of carpet had been cut out. There were bloodstains on the underside of the box springs. Later DNA testing showed the bloodstains to match Milholland's profile. In the bathroom, blood found on a door frame and door was later determined to match Yanofsky's DNA profile.

In the broken dryer in the laundry room, officers found plastic bags containing the bloody carpet that had been cut out of the back bedroom, bloody carpet padding, items of clothing, scales, and a rug.

In the back bedroom, officers found a bullet that had lodged under the carpet. A bullet hole was found in the bathroom shower stall. Officers tracked the path of the bullet through and then outside of the house, and found the bullet in the backyard. Later testing showed that both bullets, as well as a shell casing found in the bathroom, came from the .45 caliber handgun found in the closet.

A KBI fingerprint examiner found both Hill's and Jones' fingerprints on the black trash bag that was around Milholland's legs. Hill's palm print was found on Milholland's car door.

Dr. Erik Mitchell performed autopsies on the two bodies and concluded that Milholland and Yanofsky each died from a gunshot wound to the head. Mitchell also concluded that Milholland died

instantly from her injury; Yanofsky, on the other hand, was alive for a period of time after he was shot.

A sexual assault examination of Milholland's body performed during autopsy showed no traces of Hill's DNA.

Smith interviewed Hill a fourth time after he had interviewed Jones. When Smith told Hill that he believed he had killed both Milholland and Yanofsky, Hill did not deny it. When the detective told Hill that he was not a bad person and that people make mistakes, Hill replied, "How can I not be a bad person for what I've done?"

While Hill was being held pretrial in the county jail, he described details of the murders to his cellmate, Donvil Hodges.

According to Hodges, Hill said that he wanted to shoot Milholland and Yanofsky because they owed him money for marijuana. Hill said that he called the pair and asked them to come to Jones' house. When they arrived, Hill told them to go into the bathroom and weigh marijuana and said he would be right back. Jones was asleep in his bedroom at the time. Hill got a gun from the living room, went into the bathroom, and shot Yanofsky in the side of the head. Milholland began screaming and asking if Hill was going to shoot her too. Hill had her take off all of her clothes and go to the back bedroom while he cleaned the bathroom. Hill told Hodges that he had Milholland strip so that she would not try to run away.

According to Hodges, Hill also said that he positioned Yanofsky's body over the bathtub so that Yanofsky's blood would drain into the tub. As Hill was cleaning, he heard Milholland trying to get out of a window, so he went into the back bedroom. Hill told Hodges that he had sex with Milholland and then shot her in the back of the head. After Hill shot Milholland, Jones came out of his bedroom. Hill told Jones to clean the back bedroom while he cleaned the bathroom. Hill and Jones then wrapped the bodies in blankets and carried them out to the car. Hill said he was going to burn the car with the bodies inside it, but the car was running out of gas, so he jumped out of it while it was still moving.

Hill was charged with one count of capital murder, one count of first-degree premeditated murder, and one count of rape.

The capital murder count was charged in the alternative: as the intentional and premeditated killing of Milholland and Yanofsky in part of the same act or transaction per K.S.A. 21-3439(a)(6) and as the intentional and premeditated killing of Milholland during the commission of or subsequent to the crime of rape per K.S.A. 21-3439(a)(4). The first-degree murder charge was based on the murder of Yanofksy.

In a separate case, Hill was charged with possession of marijuana with intent to sell, possession of drug paraphernalia, and failure to purchase a tax stamp. Those charges were consolidated with the murder charges for trial.

The State charged Jones with two counts of first-degree premeditated murder and one count of rape but dropped the rape charge at preliminary hearing. Jones eventually pleaded guilty to reduced charges of voluntary manslaughter and aiding a felon and agreed to testify against Hill.

At Jones' plea hearing, the prosecutor stated that it based the aiding a felon charge on the determination that Jones' only involvement in the murder of Milholland was in helping to dispose of the bodies and cleaning up the scene. The State reduced the Yanofsky murder charge to voluntary manslaughter because the evidence showed Yanofsky may still have been alive when Jones carried him to the car and, the State contended, Jones assisted Hill because of the mistaken but sincerely held belief that his life would be in danger if he did not.

The question of Hill's competency to stand trial was raised first by his lawyers, who noted Hill's suspicion of them. They hired Dr. George Athey, a clinical and neuropsychologist, to examine Hill in October 2003. Athey reported that Hill understood the legal process and that his reasoning abilities were not impaired, but he was significantly hampered in his relationship with his attorneys. Specifically, Hill believed his attorneys were hiding information from him, lying to him, brainwashing him, and threatening him. Athey concluded that Hill was incompetent to assist his attorneys in his defense.

The defense filed a motion to determine competency. The district judge sent Hill to Larned State Security Hospital (Larned) for a competency evaluation.

Larned held Hill for 51 days for observation and evaluation. At the conclusion of the evaluation, the Larned treatment team issued a report that concluded Hill did not suffer from any measurable psychopathology and was competent to stand trial. The team's report stated:

"The [Forensic Evaluation Unit] Treatment Team, after considering all available information, is of the opinion that Nathaniel Lee Hill is capable of appropriately conducting himself in all aspects of the current legal proceedings. Mr. Hill is disappointed in the performance of his attorney. However, his disappointment does not appear to be a sufficient obstacle that would prevent him from working successfully with his attorney. Mr. Hill stated he feels 'powerless' to do anything in regard to his attorney's handling of his case. However, his 'powerlessness' appears to be a feature of Mr. Hill's character style rather than a specific inability to work with his attorney. Mr. Hill understands his legal charge and its possible legal ramifications. If he so chooses, he appears fully capable of rationally evaluating the evidence against him, discussing legal strategy with his attorneys or participating and cooperating in assisting his attorney with his defense. Therefore, it is the opinion of the treatment team that Nathaniel Lee Hill meets the criteria for competency to stand trial as defined by Kansas statutes."

The court then held a competency hearing. The defense presented two experts: Athey and Dr. William S. Logan, a psychiatrist.

Athey testified that he spent 12 hours with Hill. He concluded that Hill was exhibiting significant paranoia and thinking disturbances, indicating he suffered from a psychotic illness, most likely delusional disorder and possibly schizophrenia. Athey questioned the findings of the Larned team report, contending that the team overlooked the elevated paranoia scale on one of the tests, failed to get information from Hill's attorneys, and did not use the same protocol Athey had used for assessing competency. Responding to a question about medication, Athey testified that he was not a psychiatrist but that he believed antipsychotics "would be mandatory" to give Hill a chance to work effectively with his attorneys. Athey testified that, in his opinion, Hill was incompetent to assist in his own defense because of mental illness, paranoid delusional disorder, and possible schizophrenia.

On cross-examination, Athey acknowledged that he had not asked Hill specifically about his conversations with his attorneys, about whether his attorneys had recommended a plea bargain, or

about how Hill felt regarding suggestions he should accept a plea bargain. Athey also admitted that, if Hill's attorneys were recommending a guilty plea and Hill did not want to plead guilty, the disagreement could affect Hill's trust in them, but not to the degree he had observed.

Logan had interviewed Hill for approximately 4 hours a few weeks after Hill's arrest. At that time, Hill reported auditory hallucinations of God and Lucifer speaking to him, which began in late childhood and increased with drug abuse and stress. The voices sometime told him to hurt himself or others. He also noted that Hill had exhibited some paranoia concerning circumstances at the jail.

The defense team had asked Logan to reexamine Hill at a later time, expressing concern about Hill's mood swings, his disagreement with a plea offer, and his suspicion of his attorneys. Hill refused to be reexamined. Thus, when Logan was asked at the hearing if he was able to provide a current opinion about Hill's competency, he said he had no way of knowing if it was still an issue. He did say, however, that Athey's findings about Hill's paranoia, coupled with his own interview results, led him to believe that Hill was not competent to assist his lawyers in his defense. Were he Hill's prescribing psychiatrist, he would have recommended a very low dose of antipsychotic medication.

Logan also criticized the Larned report, contending that the team should have obtained information from Hill's attorneys about the types of problems they were having with him, that it failed to mention Hill's elevated paranoia score on the personality assessment, and that it failed to administer a test designed to determine competency. Logan conceded, however, that it was clinically acceptable to assess a patient through an interview.

Dr. Patrick L. Pomfrey, a psychologist on the Larned treatment team, testified for the State. He explained that Larned determines competency by going over a 30- to 45-question report similar to the protocol used by Athey, which is designed to determine the same sorts of things, *i.e.*, the nature of a defendant's relationship with his or her attorney and the defendant's understanding of the charges and court proceedings. Pomfrey testified that Hill's para-

noia score on the personality assessment was only mildly to moderately elevated, not high enough to qualify him for a delusional disorder. He also observed that it resulted from Hill's response to a single statement: "I [am] the target of a conspiracy." Hill answered: "most of the time." Pomfrey also testified that, during the 51 days the team observed and assessed Hill, he observed nothing that would have led him to believe Hill was suffering from paranoia.

Pomfrey further testified that the team talked to Hill about his relationship, or lack of relationship, with his attorneys. He conceded that what Hill described concerning that relationship could be viewed as paranoia, depending on how one viewed Hill's story. Pomfrey also testified that it was not unusual for defendants charged with serious crimes to believe there may be a conspiracy and feel paranoid; in fact, the absence of such feelings would be unusual. "[H]undreds of patients come through our unit every year, and the most pervasive complaint among all the patients . . . is their relationship with their attorneys," he said.

At the conclusion of the hearing, the district judge ruled that the defense had not met its burden to prove Hill incompetent to stand trial. The judge said:

"I'm inclined to believe that, even based upon the defense's experts in this case, that there is a preponderance of the evidence to believe that he is competent to stand trial.

. . . .

". . . [B]oth sides brought up important points. I think that there's a question there. There will probably always be a question there, but we're not talking about reasonable doubt here. . . . [I]t just appears to me that his—his inability to relate and to participate with his defense does seem to be more of a refusal or—I'm not saying that he has some scheme in mind, but in light of the fact that his mental disorder only seems to be directed towards his attorneys, it makes you wonder whether there's something more to that, but, as I said, I'm more inclined to agree with the State.

"As I said, the burden isn't reasonable doubt, and I would think that the State has met their burden insofar as that matter is concerned, or that the defense has not met their burden in proving that Nathaniel was incompetent."

The judge noted the evidence suggesting that Hill might benefit from antipsychotic medications. Accordingly, in an effort to "go

the extra mile" to make sure that there would be no competency issue, the judge ordered that Hill be medicated and deferred determination of competency until after the effect of the medication could be evaluated.

In September 2004, Dr. V.J. Reddy, a psychiatrist with Four County Mental Health Center, evaluated Hill for medication. After considering the reported disagreements with defense counsel and Hill's statement that he wanted to go to trial to have the chance of being found not guilty, Dr. Reddy noted that Hill exhibited some distorted logic based on "circumscribed feelings of distress and paranoia with the attorneys and their recommendations." Reddy diagnosed Hill with Delusional Disorder and Anti-Social Personality Disorder and prescribed Risperdal.

When Hill's competency came back before the court the following month, defense counsel requested a delay so that the medication prescribed by Reddy could have more time to take effect. The judge agreed to continue the matter but told defense counsel that he had "about closed the door on this competency issue" because of a note he received from Hill. The court read the note into the record:

" 'I'm writing to you so you can have a clearer picture in this competence [*sic*] area that we are still stuck at. Your Honor, I'm not paranoid of my lawyers. I just didn't want to work along with them at the time. Then my lawyer Mark switched to a new woman lawyer, no offense, right in the middle of this case. That just didn't make me feel too comfortable after that, and I can understand that. Judge Dent, I really don't need this medication they are giving me. I . . . can understand that. All that it is doing is giving me high blood pressure and high cholesterol problems. I am not incompetent to stand trial. I know that you, as a Judge, is [*sic*] supposed to keep order in the courtroom. The DA is supposed to try to convict me of the crime. My lawyers is [*sic*] supposed to defend me from being convicted of the crime, and the jury is to listen to both sides of the story, then choose if I'm guilty or not guilty, so I believe I am competent to stand trial, Your Honor."

Defense counsel filed a memorandum in support of Hill's motion to determine competency, attaching affidavits setting out the problems they had experienced in working with Hill. The affidavits said that Hill displayed smug contempt toward them; that his thought processes were disorganized and irrational; that he continued to be very suspicious of his defense team; that he would not

engage in discussions about his defense, evidence in the case, a plea offer, an offer of bench trial, or possible punishment; that he would not answer questions about the case and had refused to provide other information, despite repeated requests; that he used bizarre religious excuses to avoid discussing the case; that he did not appear to understand their role in the process; that he did not appear to understand the gravity of the situation and did not comprehend the evidence against him; and that there had been no improvement in his behavior.

The district judge held another competency hearing. Neither party presented further evidence.

In argument, defense counsel pointed out that neither Athey nor Logan was able to reevaluate Hill because Hill refused to permit them to do so. Defense counsel also noted that Reddy had, within the past week, increased Hill's medication dosage. Moreover, the note Hill had written to the judge should be evidence of Hill's refusal to cooperate rather than competency; the judge had previously admonished Hill not to write directly to the court.

The State argued that the only area in which Hill had a problem was cooperation with counsel, which indicated a voluntary choice rather than lack of competency.

The court ruled that Hill was competent to stand trial, specifically noting that there was a difference between not being able to participate in a defense and choosing not to do so.

The following January, defense counsel filed a new competency motion. A different defense expert, Dr. Peter Graham, a clinical psychologist, had recently evaluated Hill and determined that he was incompetent to stand trial. In addition, defense counsel noted they were still unable to work effectively with Hill, because he continued to refuse to listen to legal advice or discuss possible affirmative defenses, cross-examination topics, plea agreements, and the possibility of bench trial.

Another competency hearing followed. Richard Burr, an experienced capital defense attorney, and Graham, testified for the defense.

According to Graham, Hill suffered from delusional thought processes, including a belief that certain Bible verses referred to

what was destined to happen in his trial. Hill had claimed to see pages of the Bible turn by themselves and open to particular verses. Based on those verses, he believed that the charges against him would be dropped when he got into the courtroom. Graham testified that these delusions had affected Hill's ability to appreciate the role of his attorneys and had interfered with the type of interaction necessary to prepare a defense.

On cross-examination, Graham testified that Hill understood the charges against him and was capable of making choices. Further, he acknowledged that Hill had made a choice to rely on the Bible and his faith, rather than on his attorneys.

Burr had met with Hill for 2½ hours and had reviewed all of the reports and evaluations, as well as summaries of problems the defense team had experienced with Hill. Burr testified that he had grave concerns about Hill's ability to assist in his defense, specifically including Hill's persistent refusal to discuss the evidence; his belief that the evidence against him was insubstantial; his refusal to consider plausible defense theories; his chronic distrust; his refusal to provide relevant information; his report of a hallucination that ants were crawling all over him; and his belief that the case would be dismissed because his name appeared on the complaint in capital letters.

On cross-examination, Burr testified that, when he asked Hill what his defense should be, Hill said he was not involved in the crimes and was not at the scene when they occurred. Burr asked Hill if he had given his attorneys the identity of the person he was with at the time of the murders; Hill said he had not. Burr tried to get Hill to tell him more so that he could pass the information on to Hill's lawyers; Hill refused.

The district judge denied the new competency motion, observing that it was not necessarily delusional for a person of faith to believe the Bible referred to him or her specifically. The judge also stated that Hill appeared to be making voluntary choices about the defenses that would be developed and presented.

At the conclusion of the hearing, the court asked Hill about his medication, which Hill had refused to take. Hill said the medication gave him bad headaches and made him sleepy. He also said

that he did not think the medicine had any effect on his relationship with his attorneys. Rather, he "just didn't agree with what they wanted, a plea bargain or nothing like that." Hill told the judge that he wanted to go to trial and that he was not going to take the medication any longer.

The judge also asked Hill about his refusal to consider asserting affirmative defenses. Hill responded:

> "All the defenses that they have that I refused is still going to prove me guilty, no matter what. They're still saying I done it or I was on drugs when I done it. I'm still going to be proved guilty of something. There's no way for me to be proved not guilty, not guilty at all, so the one I picked is giving both sides."

The judge asked Hill if he understood that such a choice was against the better judgment of his attorneys. Hill affirmed that he did understand and that he had nevertheless made his decision.

During voir dire, Hill challenged the State's attempt to use peremptory strikes to remove the panel's only three African-American members, invoking *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986) (Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits use of peremptory challenges to strike jurors on basis of race). Hill is African-American.

Applying the first step of the three-step *Batson* analysis, the district judge ruled that Hill had made a *prima facie* showing that the strikes were race-based. Accordingly, the judge ordered the State to articulate a race-neutral explanation for the strikes.

The judge accepted the State's explanation as to one juror and rejected it as to a second. Those strikes are not at issue on this appeal.

With respect to the third strike of prospective juror S.B., the prosecutor offered two explanations: (1) S.B. stated during voir dire that she would not listen to or believe the testimony of a codefendant who was testifying under a plea agreement; and (2) S.B. had stated in response to her jury questionnaire that she was personally, morally, and religiously opposed to the death penalty and would never vote to impose it regardless of the circumstances of the case. The prosecutor was concerned that S.B.'s opposition to the death

penalty might prompt her to vote against conviction for capital murder, even though, in this particular case, this jury would not be considering the death penalty. The district judge accepted the State's explanations and permitted removal of S.B. from the panel.

At trial, defense counsel lodged a continuing objection to the competency determination.

Also at trial, Jones testified about a handwritten note he had received from Hill while they were both in jail. Jones testified that his brother, who also was in jail at the time, got the note from Hill and delivered it to Jones. The note was not signed by Hill. The pertinent exchange between the prosecutor and Hill on the origin of the note reads:

"Q.   [PROSECUTOR] Did you recognize the note as being from the Defendant?

"A.   [JONES] It sounded like stuff he would have said in it.

"Q:   I'm sorry?

"A.   It sounded like he wrote it, or whatever.

"Q.   It sounded like words the Defendant would say and use?

"A.   Yeah.
. . . .

"Q.   And having been best friends with the Defendant for quite a number of years, are you convinced [the note] is from the Defendant?
. . . .

"A.   Yeah."

The note stated:

"Sly, I got you out this shit. But the drugs I can't. I'm going to do a statement with Harry Smith. ['I did' is written to the side with an arrow to that sentence]. And tell them I done it all and you was sleep when it went down! I'll tell them I put the bag in your house, with out you knowing. (Scott Free you).

"P.S. When you walk. Remember I was there for you. I know you understand. I was never late. I'm glad I seen your face one more time.

"P.S.S. Ball harder then your brother. If you still have that money give to my mom!! Watch out for my two kids Sly please in money, clothes shit like that

"Lil Bro

"Much Real Love

"I was heated man they didn't have none of my $2,000

"gave them

"2 ps

"1 QP

"They played me Sorry it was at momma home [crying face]
"Nigga Don't Forget About My Games My Mother House Please Take!! [smiley face]."

The defense objected to admission of the note, arguing that the State had failed to establish sufficient foundation because Jones did not testify that he was familiar with Hill's handwriting. The district judge overruled the objection.

Hill also objected to admission of an autopsy photograph of Yanofsky's brain with a rod through it, which showed the trajectory of the bullet. The district judge overruled the objection. Coroner Mitchell used the photograph during his testimony to illustrate that the bullet passed through portions of the brain controlling emotions and voluntary activity and, thus, did not result in immediate death. Other photographs showed blood spatter on the body that, Mitchell testified, was caused by Yanofsky when he coughed blood out of his airway. Mitchell depended upon the brain photograph and the blood spatter photographs to demonstrate that Yanofsky remained alive for a period of time after he was shot.

At the conclusion of the State's case, defense counsel informed the district judge that Hill would not be presenting any evidence. However, the defense proffered evidence of voluntary intoxication and diminished capacity, defenses that would have been asserted if Hill had been competent to stand trial. After the proffer, the judge asked Hill if he understood that the voluntary intoxication and diminished capacity defenses were not being presented and whether it was his conscious decision not to raise them. Hill said that he understood and that it was his decision.

The instructions given to Hill's jury included an instruction on first-degree premeditated murder of Yanofsky and on second-degree murder as a lesser-included offense of first-degree murder. The defense requested an instruction on voluntary manslaughter as another lesser-included offense of first-degree murder, arguing that testimony about a fight between Hill and Yanofsky was sufficient to show heat of passion. The judge refused to give the voluntary manslaughter instruction.

The jury found Hill guilty of capital murder, first-degree murder, possession of marijuana with intent to sell, possession of drug paraphernalia, and failure to purchase a tax stamp. The jury acquitted Hill of rape.

At Hill's sentencing hearing on April 4, 2005, the district judge deferred decision on the capital murder conviction, pending a final decision in *Kansas v. Marsh,* 548 U.S. 163, 165 L. Ed. 2d 429, 126 S. Ct. 2516 (2006), concerning the constitutionality of the Kansas death penalty. On the remaining convictions, the judge sentenced Hill to a hard 50 on the first-degree murder, 22 months on the possession of marijuana with intent to sell, and 6 months on the tax stamp offense, all consecutive. The judge also sentenced Hill to a concurrent 12 months in the county jail for misdemeanor possession of drug paraphernalia.

Hill's appeal on the noncapital convictions and his sentencing on the capital conviction were stayed pending *Marsh*. After the United States Supreme Court issued its *Marsh* decision upholding the death penalty in June 2006, the district judge set the penalty phase of Hill's capital proceeding to begin the following January. That proceeding was rescheduled several times while the issue of Hill's competency was, again, addressed.

Finally, in August 2008, the district judge granted a State motion to withdraw its notice of intent to seek the death penalty and to vacate the sentence on the first-degree murder conviction, based on this court's decision in *State v. Scott,* 286 Kan. 54, 183 P.3d 801 (2008). Two months later, the district judge sentenced Hill to life without the possibility of parole on the capital conviction. He ordered the sentence to run consecutive with the other remaining sentences.

*Voluntary Manslaughter Instruction*

The first issue before us is whether the district court erred in rejecting the defense request for a lesser included instruction on heat-of-passion voluntary manslaughter.

When the defendant requests a lesser included offense instruction, a trial judge is required to give it " 'where there is some evidence which would reasonably justify a conviction' " of the lesser

included crime. See *State v. Houston*, 289 Kan. 252, 273, 213 P.3d 728 (2009) (quoting K.S.A. 22-3414[3] and *State v. White*, 284 Kan. 333, 347, 161 P.3d 208 [2007]). " ' "An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented." ' " *Houston*, 289 Kan. at 274 (quoting *White*, 284 Kan. at 347). In determining whether a defendant is entitled to a lesser included offense instruction, the evidence must be viewed in the light most favorable to the defendant. *Houston*, 289 Kan. 252, Syl. ¶ 12.

Voluntary manslaughter is "the intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). Heat of passion is defined as " 'any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection.' " *State v. Robertson*, 279 Kan. 291, 305, 109 P.3d 1174 (2005) (quoting PIK Crim.3d 56.04[e]).

To be entitled to an instruction on voluntary manslaughter based on an act in the heat of passion, Hill's " 'emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation.' " *State v. Vasquez*, 287 Kan. 40, 55, 194 P.3d 563 (2008) (quoting *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 [1985]). Legally sufficient provocation is " 'calculated to deprive a reasonable [person] of self-control and to cause [the defendant] to act out of passion rather than reason.' " *Vasquez*, 287 Kan. at 55-56 (quoting *State v. Horn*, 278 Kan. 24, 42, 91 P.3d 517 [2004]). Whether provocation is legally sufficient is an objective, not a subjective, determination. See *Robertson*, 279 Kan. at 306.

Hill argues that evidence that he shot Yanofsky as they were fighting was sufficient to reach a jury on voluntary manslaughter. He relies on the following testimony of the detective who interviewed him:

"Q. [PROSECUTOR]   I also want to talk to you about the Defendant's version where he was fighting with Sam in the bathroom.

"A. [DETECTIVE] . . . [I]nitially he told me they were fighting, and he told me the living room area, the hallway, and then we ended up in the bathroom.

"Q. Okay, so they start in the living room and then they go to the bathroom?

"A. Yes.

"Q. And then somewhere in there, a gun somehow gets slid to him?

"A. Yes.

"Q. Okay. Where did the Defendant say he was in the bathroom when he shot Sam?

"A. He said he was on the floor and Sam was on top of him.

"Q. So he was laying on the floor and Sam Yanofsky was on top of him?

"A. Yes.

"Q. And how did he say he shot Sam?

"A. He said he picked up the gun and told Sam to quit, told him to quit a couple of times. Sam wouldn't, and the gun discharged by accident."

In Hill's view, this evidence that Yanofsky was on top of him supported an assault and battery by Yanofsky, making it reasonable that Hill could have been in fear of great bodily harm. *State v. Brown*, 285 Kan. 261, Syl. ¶ 25, 173 P.3d 612 (2007) ("[P]rovocation must be more than mere words or gestures and, if assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death."). The problem with this argument is that this testimony cannot support an *intentional* shooting, which is required for a heat-of-passion voluntary manslaughter.

Certainly, there was other evidence at trial that Hill intentionally shot Yanofsky. Indeed, that was the State's theory of the case. And there was some evidence about a fight between Yanofsky and Hill. But there was no evidence that Hill intentionally shot Yanofsky because he was provoked into doing so.

Under these circumstances, the district judge did not err in rejecting Hill's request for a heat-of-passion voluntary manslaughter instruction. It is of no moment that Jones ultimately was permitted to plead guilty to voluntary manslaughter under an aiding and abetting theory, as Hill suggests but does not support. See *State v. Torres*, 280 Kan. 309, 321, 121 P.3d 429 (2005) (simply pressing point without pertinent authority, without showing why it is sound despite lack of supporting authority akin to failing to brief issue). Finally, we need not reach the skip rule relied upon by the State,

as there was no error in need of the cure it may provide. See *Houston*, 289 Kan. at 276 (unnecessary to reach skip rule because judge did not err).

*Peremptory Challenge*

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges to strike potential jurors on the basis of race. Analysis of a *Batson* challenge, such as that pursued by Hill here, involves three distinct steps, with different standards of review applied to each step. See *State v. Angelo*, 287 Kan. 262, 272, 197 P.3d 337 (2008) (discussing *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 [2006]).

The first step in the *Batson* analysis requires that a defendant make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Appellate review of the district judge's decision on this step is plenary. *Angelo*, 287 Kan. at 271.

Second, once a defendant makes a prima facie showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the prospective juror. The prosecutor's burden is one of production, not persuasion. Thus the explanation does not have to be persuasive, or even plausible; it need only be facially valid. Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Angelo*, 287 Kan. at 271. "[T]he ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike." *Angelo*, 287 Kan. at 272.

Third, the district judge determines the ultimate question— whether the defendant has carried his or her burden of proving purposeful discrimination. 287 Kan. at 272 (quoting *Pham*, 281 Kan. at 1237). The decision on this step hinges on credibility determinations and is reviewed for abuse of discretion. See *Pham*, 281 Kan. at 1237 (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65, 114 L. Ed. 2d 395, 111 S. Ct. 1859 [1991]) (Decisive question in typical peremptory challenge inquiry whether counsel's

race-neutral explanation should be believed; seldom much evidence bearing on issue; best evidence often demeanor of attorney exercising challenge; evaluation of such demeanor "peculiarly within a trial judge's province"); compare *Thaler v. Haynes*, 559 U.S. 43, 175 L. Ed. 2d 1003, 130 S. Ct. 1171 (2010) (when demeanor of venire member placed in issue by *Batson* challenge, ruling judge need not have observed or remember venire member's demeanor).

Hill's appellate challenge based on *Batson* focuses on the credibility of the State's proffered explanations for striking S.B., *i.e.*, on the third step of the three-step analysis. If the explanations are "implausible or fantastic justifications," they may be "pretexts for purposeful discrimination." *State v. Patton*, 280 Kan. 146, 166, 120 P.3d 760 (2005) (citing *Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 115 S. Ct. 1769 [1995]), *disapproved on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

Hill argues that the prosecutor's concern about S.B. not listening to or believing a codefendant's testimony was unbelievable because the record did not support it. This is not the whole story. S.B. initially stated that she would not listen to a codefendant's testimony; she later said she would listen to such testimony but would consider it with suspicion. As Hill notes, S.B.'s second statement is consistent with the standard pattern accomplice instruction, which was given in this case. See PIK Crim. 3d 52.18 (jury "should consider with caution the testimony of an accomplice"). And the district judge's earlier refusal to strike S.B. for cause was correct.

It does not follow, however, that S.B.'s survival of a challenge for cause made her immune to peremptory strike. The rejection of the State's challenge for cause does not mean that it could not employ similar reasoning as a basis for a legitimate peremptory challenge. To be valid under *Batson*, the prosecutor's "explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. Moreover, the purpose of a peremptory challenge is to strike prospective jurors not subject to challenge for cause but who are believed to be "inclined against" a party's interests. *Morrison v. State*, 818 So. 2d 432, 443-44 (Fla. 2002) (quoting *Holland v. Illinois*, 493 U.S. 474, 480, 107 L. Ed. 2d

905, 110 S. Ct. 803 [1990]) (not improper for State to " 'exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause' ").

Hill also attacks the validity of the State's second reason for striking S.B.: her questionnaire response about her opposition to the death penalty. In his view, this explanation was pretextual for three interrelated reasons.

First, Hill argues, the jury was not going to decide whether to impose the death penalty on Hill; thus S.B.'s questionnaire response was irrelevant. We see no abuse of discretion on this basis. It would have been reasonable for the prosecutor to regard a person with strong convictions against the death penalty as less likely to vote guilty as well, even if he or she had been told that jurors would bear no direct personal responsibility for choosing the defendant's punishment for the capital crime in this case. Even if it were not reasonable, such a rationale for the peremptory strike of S.B. was race-neutral, the only issue before the district judge. See *State v. Trotter*, 280 Kan. 800, 816, 127 P.3d 972 (2006) (State's use of peremptory challenge to strike African-American venire member because of equivocal statements on death penalty race-neutral); see also *United States v. Ortiz*, 315 F.3d 873, 897 (8th Cir. 2002) (peremptory strike based on opposition to death penalty valid, race-neutral); *Morrison v. State*, 818 So. 2d at 444 (citing *Walls v. State*, 641 So. 2d 381, 386 [Fla. 1994]) (prospective juror's discomfort with death penalty sufficient race-neutral reason for State's peremptory strike).

In Hill's second argument on this point, he appears to characterize the State's peremptory challenges as a method to "death qualify" the jury inappropriately, making conviction more likely and his trial unfair. Again, this argument has nothing to do with whether the prosecution's explanation was credibly race-neutral. Furthermore, this argument runs contrary to the United States Supreme Court's holding in *Lockhart v. McCree*, 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986). The *Lockhart* Court rejected the proposition that a death-qualified jury, even if more prone to convict of capital murder than a non-death-qualified jury, was constitutionally prohibited. *Lockhart*, 476 U.S. at 173. We see nothing,

and Hill directs us to nothing, contrary to *Lockhart* in Kansas constitutional or statutory law.

Lastly, Hill asserts that the State's pretext is exposed by its failure to ask S.B. any questions about whether her position on the death penalty would affect her decision in the guilt phase of his trial. Hill relies on language from *Esteves v. State*, 859 S.W.2d 613, 615 (Tex. App.1993): When "a prosecutor makes an assumption about a prospective juror but does not question the prospective juror to verify the assumption, it is some indication that [a] strike was not race-neutral."

*Esteves* is entirely distinct from this case. In it, the prosecutor did not ask a prospective juror any questions before using a peremptory challenge to strike her. When challenged, the prosecutor stated that she had struck the juror because the juror had been staring at her, and the prosecutor thus assumed the juror was a member of the defendant's family. *Esteves*, 859 S.W.2d at 614-15. On appeal, the court held the prosecutor's explanation was not race-neutral, given the prosecutor's failure to examine the prospective juror and the obvious illogic of the assumption she made in the absence of such examination. See *Esteves*, 859 S.W.2d at 615 (citing *Keeton v. State*, 749 S.W.2d 861, 866 [Tex. Crim. 1988]). We are not faced with similar facts here. Hill's prosecutor did not rely on ambiguous and subjective factors such as eye contact, posture, hairstyle, or body language to speculate about S.B.'s position on the death penalty. There was no need for speculation, whether logical or illogical. S.B. had made an unequivocal statement about her position on the death penalty. Again, that position was a race-neutral reason for the State's peremptory strike.

In addition, we have previously held that the State need not "probe more deeply" into the effect of the prospective juror's answers on his or her ability to be fair and impartial in order to uphold a peremptory strike as race-neutral. *Trotter*, 280 Kan. at 816. Even the State's failure to ask any questions of a stricken minority juror does not necessarily give rise to an inference that its strikes were racially motivated. A prosecutor need not "specifically inquire about the link between its stated reason and the possible effect on the potential juror's service[.]" 280 Kan. at 816-17.

The district judge heard S.B.'s answers during voir dire and observed her demeanor. He also assessed the credibility of the prosecutor's explanations. Both reasons for the strike given by the prosecutor appear to be supported by the record and are race-neutral. There was no abuse of discretion.

*Admission of Photograph*

Hill argues the district judge abused his discretion in admitting an autopsy photograph of Sam Yanofsky's brain, because the photograph, depicting the brain with a flexible rod through it, was gruesome and inflammatory and irrelevant to any fact in issue in the case.

In *State v. Riojas*, this court stated:

"The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion." 288 Kan. 379, 387, 204 P.3d 578 (2009) (citing *State v. Sappington*, 285 Kan. 176, 194, 169 P.3d 1107 [2007]).

Such discretion is abused " ' "when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice." ' [Citations omitted.]." *State v. Carter*, 284 Kan. 312, 329, 160 P.3d 457 (2007).

"Generally, all relevant evidence is admissible. Evidence is relevant if it renders a desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact." *Carter*, 284 Kan. at 328 (citing K.S.A. 60-401[b] and *State v. Sexton*, 256 Kan. 344, 349, 886 P.2d 811 [1994]). Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in murder cases. *Riojas*, 288 Kan. at 387. Even photographs that are gruesome are relevant and admissible if they aid a pathologist in explaining the cause of death. 288 Kan. at 387. Further, because the State has the burden of proving all the elements of the crime charged, photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible

even if a defendant does not contest the cause of death. 288 Kan. at 387.

Hill argues that the only point of the photograph was to demonstrate that Yanofsky did not die immediately after he was shot. That point, he argues, was relevant in only two possible ways: to prove the "heinous, atrocious, and cruel" aggravating factor in a capital penalty phase or to corroborate Jones' testimony tending to show Yanofsky did not die immediately. The first use was premature, according to Hill, and the second use was unnecessary because Mitchell's testimony and the blood spatter pictures were adequate to the State's purpose. Hill also argues that he did not contest Mitchell's assertion that the blood spatters resulted from Yanofsky coughing up blood after being shot. In short, the brain photo was not needed to show the trajectory of the bullet.

The State responds that the trajectory of the bullet that killed Yanofsky was relevant to the fact and manner of death and the violent nature of the crime. In addition, the photograph helped Mitchell to explain the nature and extent of Yanofsky's injuries and supported the State's theory that he survived for some time after being shot, which was relevant to premeditation and intent. The State concedes that it also believed the photograph would eventually be relevant to the "heinous, atrocious, and cruel" factor at sentencing, but it did not ultimately rely on that factor.

The State has the more persuasive argument on this issue.

Although Hill did not contest the State's theory that Yanofsky initially survived the gunshot wound, the State still had the burden to prove all of the elements of the crime, including cause and manner of death. The brain photograph was relevant on this point. Also, the evidence that Hill did not seek medical attention for Yanofsky circumstantially supports premeditation and intent to kill. See *State v. Holmes*, 278 Kan. 603, 634, 102 P.3d 406 (2004) (circumstantial evidence of premeditation when defendant saw blood bubbling out of victim's mouth, did not seek medical attention for her); see also *State v. Warledo*, 286 Kan. 927, 946, 190 P.3d 937 (2008) (blood spatter photographs relevant, admissible because they helped illustrate violent nature of crime, fact tending to prove defendant acted with intent to kill).

We also do not believe that the prejudicial nature of the photograph substantially outweighed its probative value. See *Warledo*, 286 Kan. at 945. The photograph was not unduly repetitious or cumulative. See *Carter*, 284 Kan. at 329. It was the only photograph that illustrated the pathologist's testimony explaining how a bullet could pass though Yanofsky's brain without killing him instantly. The gruesome nature of this photograph was not "so extreme that it compels the conclusion it was admitted solely to cause undue prejudice" to Hill, see *Carter*, 284 Kan. at 329, in spite of any "special care" to be taken in the admission of autopsy photographs. See *State v. Hernandez*, 284 Kan. 74, 100, 159 P.3d 950 (2007) (quoting *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 [1998]); compare *State v. Hoffman*, 288 Kan. 100, 108-09, 200 P.3d 1254 (2009) (autopsy photographs of victim's cranial cavity, brain, and larynx not unduly gruesome), with *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975) (error to admit autopsy photographs unnecessarily showing effect of autopsy on victim's body).

There was no abuse of discretion on this issue.

*Admission of Handwritten Note*

Hill next argues that the district judge abused his discretion in admitting the handwritten note purportedly written by Hill.

Defense counsel objected to admission of the note based on chain of custody; however, the explanation of the basis for the objection was failure to authenticate, not chain of custody. Both grounds for objection attack foundation. See *State v. Taylor*, 231 Kan. 171, 174, 642 P.2d 989 (1982) (chain of custody part of foundation for admission of physical evidence); *State v. Milum*, 202 Kan. 196, 198, 447 P.2d 801 (1968) (authentication provided sufficient foundation for admission of note). The State does not challenge the adequacy of Hill's preservation of this issue for appeal. We thus move to the merits of whether the note was sufficiently authenticated.

"Whether or not the authenticity of a writing is sufficiently established to render it admissible in evidence is a matter largely within the discretion of the trial court. [Citations omitted.]" *State v. Milum*, 202 Kan. at 198.

K.S.A. 60-464 provides: "Authentication of a writing is required before it may be received in evidence. Authentication may be by evidence sufficient to sustain a finding of its authenticity or by any other means provided by law."

Hill cites *State v. Plaskett*, 271 Kan. 995, 1018, 27 P.3d 890 (2001), in support of his argument. In *Plaskett*, a prosecution of a stepfather for sexual abuse of his stepdaughter, the district court refused to admit letters written to the victim by her biological father on hearsay grounds when the biological father was not present and did not testify. The victim had identified the handwriting in the letters as that of her biological father. *Plaskett*, 271 Kan. at 1015-16. On appeal, this court ruled that defendant did not seek to admit the statements in the letters for the truth of the matter asserted; thus hearsay was not a proper basis for excluding them. Instead, this court ruled that the district court judge should have evaluated admissibility of the letters under K.S.A. 60-464. Applying that rule, the notes were properly authenticated. *Plaskett*, 271 Kan. at 1017-18. The Plaskett opinion notes that the victim identified her biological father's handwriting, but the court did not hold that such an identification is indispensable to sufficient authentication of the handwritten documents under K.S.A. 60-464.

Under Kansas law, "[t]he authorship or authenticity of a letter 'may be proved by indirect or circumstantial evidence, as other facts.' " *State v. Uhls*, 121 Kan. 587, 598, 249 Pac. 597 (1926). "Authenticity or genuineness of a writing may be proved not only by establishing the genuineness of the writer's signature, or identity of the handwriting contained in the instrument, but also, under proper circumstances, by indirect or circumstantial evidence without resort to proof of handwriting. [Citations omitted.]" *Milum*, 202 Kan. at 197. When "the contents themselves reveal knowledge peculiarly referable to a certain person or the contents are of such nature that the letter could not have passed between persons other than the purported writer and the person to whom it was delivered[,]" circumstantial evidence is sufficient. *Milum*, 202 Kan. at 198.

The facts of our *Milum* case were very similar to those before us now, and its reasoning provides guidance. In *Milum*, the con-

tested writing was a note signed with the defendant's first name and sent through a jail employee to the defendant's alleged accomplice. The note told the alleged accomplice that he would be " 'taken care of' " if he testified against the defendant. *Milum*, 202 Kan. at 197. The alleged accomplice was unable to identify the handwriting as the defendant's, but he said that he knew no one else at the jail with the same name as the defendant and that he had never had trouble with any person by that name except the defendant. *Milum*, 202 Kan. at 197.

On appeal this court applied the rule that a party may show the authenticity of a document by circumstantial evidence. *Milum*, 202 Kan. at 198. The note's contents and other circumstantial evidence supported a reasonable inference that the defendant had written the note, which was adequate proof of its authenticity and supported its admission into evidence. *Milum*, 202 Kan. at 198.

In this case, Jones testified that Hill passed the note to Jones' brother, who then passed the note to Jones. Although Jones was not asked if he recognized the handwriting in the note as Hill's, he did testify that he was certain Hill wrote the note because its contents "sounded like stuff he would have said" and "[i]t sounded like he wrote it, or whatever." In addition, Jones was Hill's best friend; this relationship further supported his certainty that Hill authored the note. The note also referred to facts about the case that could give rise to additional inferences about Hill's authorship.

Under these circumstances, the State sufficiently authenticated the note for admission into evidence. The district judge did not abuse his discretion.

## Competency to Stand Trial

Hill next argues that the district judge erred in finding him competent to stand trial because the evidence established that he was unable to assist in his defense and that he did not have an understanding of the charges against him.

Our standard of review is abuse of discretion:

" 'On appeal, a reviewing court's inquiry regarding the decision of a district court that a defendant is competent to stand trial is whether the trial court abused its discretion. [Citation omitted.] Judicial discretion is abused where no reasonable

person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' [Citations omitted.]" *State v. Kleypas*, 272 Kan. 894, 984, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004).

K.S.A. 22-3301(1) provides the pertinent definition: "[A] person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable: (a) To understand the nature and purpose of the proceedings against him; or (b) to make or assist in making his defense."

A criminal defendant may not be tried unless he or she " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.' " *State v. McKinney*, 265 Kan. 104, 107, 961 P.2d 1 (1998) (quoting *Dusky v. United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 [1960]). " ' "[I]f the accused is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition with reference to such proceedings, and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subject his mind may be deranged or unsound." [Citations omitted.]' " *State v. Shopteese*, 283 Kan. 331, 341, 153 P.3d 1208 (2007) (quoting *Van Dusen v. State*, 197 Kan. 718, 722-23, 421 P.2d 197 [1966]).

A criminal defendant is presumed competent to stand trial. *State v. Cellier*, 263 Kan. 54, Syl. ¶ 6, 948 P.2d 616 (1997). The party who raises the issue of competence has the burden of going forward with the evidence, and the burden of proof is preponderance of the evidence. *Cellier*, 263 Kan. 54, Syl. ¶ 4.

Counsel for Hill argues:

"There is no rational spin that can be put on Mr. Hill's refusal to consult with his attorneys about a trial defense, and his simultaneous refusal to engage in plea bargains. His understanding of the proceedings against him was irrational where his interpretation of specific biblical passages showed him that the charges would be dismissed on the first day of trial."

Counsel asserts that Hill's inability to assist in his defense deprived him of the benefit that could have been gained from affirmative defenses of voluntary intoxication and diminished capacity.

The State contends in response that the district judge's determination of Hill's competency followed careful deliberation and weighing of the extensive evidence. It was, the State asserts, within the district judge's discretion if he chose to give more weight and credit to the conclusions of Larned staff members or his own interactions with Hill, when compared with the opinions of defense experts.

Defense counsel directs our attention to three cases in the substantive portion of his argument on this issue.

The first, *Drope v. Missouri*, 420 U.S. 162, 177-78 n.13, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975), dealt with the relevance of defense counsel's opinions on a defendant's competency. The record before us demonstrates that the district judge considered defense counsel's opinions on Hill's ability to comprehend the proceedings and assist in his own defense. The judge specifically stated:

"I have no reason to ever doubt anything [defense counsel] would ever say or tell me, but what — what might be one person's lack of cooperation might be cooperation to another person, and it just may be that you're basing Nathaniel's appearance of inability or lack of cooperation against all of the other cases where, I'm sure, there was, probably, in some cases more than enough cooperation, and it just seems hard to believe that someone charged as Nathaniel is charged would — would be unwilling to participate, as you feel that he should, but perhaps, for some reason, Nathaniel thinks that this is what is in his best interest and that's the road that he's decided to travel down, and if that continues, then I — I want to say I'm sorry, and I hope that that's not the case, because as you've so eloquently put in your memorandum, not only is it my duty, but it is everyone's duty to try and provide him with the fairest possible trial as possible, and I would hope that he would participate as much as you think is necessary so that you could feel that he is getting the fairest trial — or defense that could be presented, so . . . I've made a determination that Nathaniel is competent to stand trial."

The second case cited by defense counsel is *State v. Davis*, 277 Kan. 309, 85 P.3d 1164 (2004). *Davis* concerned an ineffective assistance claim based on failure to request a second competency hearing. In that case, the defendant had a long history of more than 30 hospitalizations and treatment for various mental health

issues; he was not consistently taking prescribed antipsychotic medication while in custody awaiting trial; he was found incompetent and committed to Larned. While there, he took his medication and, eventually, was found competent to stand trial. *Davis*, 277 Kan. at 316-18. The district judge· appointed new defense counsel for the defendant; and, before trial, that counsel received four incomprehensible notes from the defendant. The defendant also stopped taking his medication and began having hallucinations. *Davis*, 277 Kan. at 318-20, 323. Although counsel had some doubts about the defendant's competency, he did not pursue the issue. *Davis*, 277 Kan. at 319-22.

This court held that trial counsel was ineffective for failing to investigate the defendant's competency and for failing to seek another competency hearing. The combination of the defendant's extensive history of mental illness and frequent commitments, the evidence supporting the first determination of incompetency, the fact that the defendant was found competent only after being treated at Larned and taking his medication consistently, and the four incomprehensible notes meant that counsel was required to investigate the competency issue anew and seek a hearing. *Davis*, 277 Kan. at 323-24.

Although it is true that Hill, like the defendant in *Davis*, stopped taking his medication, the similarities between his case and *Davis* end there. In *Davis*, the functioning of a defendant who was found to be incompetent thereafter improved with medication and then deteriorated without it. Here, the district judge did not rule that Hill was incompetent before he began taking medication; rather, the judge held his ruling on competency in abeyance before any medication was administered. After Hill spent time being evaluated and took and refused to take medication, the judge ruled that Hill was competent to stand trial under all of the evidence marshaled by the State and diligent defense counsel. *Davis* did not decide that a defendant's neglect or refusal to take medication designed to enhance his or her mental health would require a district court's finding of incompetence to stand trial. It merely illustrated that such neglect or refusal can be among the factors considered on the competency issue. That is exactly what happened here.

The last case to which defense counsel refers us on the competency issue is *State v. Barnes*, 263 Kan. 249, 948 P.2d 627 (1997). *Barnes*, in the defense view, is distinguishable.

In *Barnes*, a defense expert testified that the defendant suffered from paranoid schizophrenia, depressive disorder, post-traumatic stress disorder, and dementia from a possible childhood head trauma. In his opinion, the defendant was incompetent to stand trial

"because he was preoccupied with delusions and would not be able to testify in a rational manner or assist in his defense . . . [T]he defendant might possibly feel paranoid and believe his attorney to be against him and, as a result, might withhold information from his attorney. Further, . . . the defendant's borderline mental retardation would make it difficult for him to understand the courtroom proceedings." *Barnes*, 263 Kan. at 264.

On cross-examination, the defense expert testified that the defendant understood the nature of the court proceedings and was able to describe the functions of many of the participants in the courtroom, including defense counsel. *Barnes*, 263 Kan. at 264.

The State's expert testified that the defendant was competent, that he understood the legal process, and that he was able to cooperate and answer questions in a coherent manner. In his opinion, there was "no evidence of thought disorder or paranoid delusions," and the "defendant could remember the conversation from one visit to the next and understood generally the role of various components of the legal process." *Barnes*, 263 Kan. at 259, 264.

On appeal, this court recognized that the parties had presented conflicting evidence but affirmed the district judge's competency determination, giving appropriate deference under the governing standard of review:

"It is undeniable that the defendant has some mental problems. However, there is conflicting evidence on the question whether these problems would render him incompetent to stand trial. Both expert witnesses who testified indicated that the defendant had comprehension of the roles of the various participants in the trial and understood the crimes with which he was faced, as well as the possible ramifications of conviction of those crimes. As for his ability to help with his defense, the evidence indicated that the defendant was able to respond appropriately in court and cooperate with his attorney to the extent that the defendant refused to be examined by [a State expert] without his attorney present. Although [the de-

fense expert] testified that the defendant's alleged paranoia might cause him to fail to cooperate with his defense attorney, this was mere speculation, and there was no indication that such paranoia surfaced during trial.

"The testimony regarding the defendant's memory retention ability is an area of concern. However, although [the defense expert] testified that the defendant was woefully deficient in this area, [the State's expert] testified that he saw no problems with the defendant's ability to recall recent events. [The State's expert] also testified that the defendant met many of the factors which would at least indicate the defendant might be malingering.

"Based on these factors, the district court's determination that the defendant was competent to stand trial was not one with which no reasonable person would agree. Under our standard of review, we conclude that the district court did not abuse its discretion." *Barnes*, 263 Kan. at 264-65.

We do likewise here. The district judge in this case had before him conflicting evidence on Hill's mental stability. He acted well within his discretion in weighing this evidence and the parties' competing arguments. To the extent he trusted the opinions originating from the Larned team more than those from the defense, he was entitled to do so. In addition, there was ample evidence tending to demonstrate that Hill's problems with his counsel related to his disagreement with their recommendations. Hill's interactions with the judge reinforced that interpretation, as well as the judge's ultimate conclusion that he was capable of cooperating with counsel, if he chose to do so. A district judge has authority to consider his or her observations of a defendant in assessing competency. See *Cellier*, 263 Kan. at 71 (judge's observations appropriately considered); see *Barnes*, 263 Kan. at 264-65 (defendant's responses in court supported conclusion on his ability to help with his defense).

Under the circumstances of this case, there was sufficient evidence that Hill understood " ' "the nature and object of the proceedings going on against him[,] . . . rightly comprehend[ed] his own condition with reference to such proceedings, and [could] conduct his defense in a rational manner[.]" ' [Citations omitted.]" *Shopteese*, 283 Kan. at 341. It cannot be said that no reasonable person would have found the defendant competent to stand trial; thus the district judge did not abuse its discretion.

*Conclusion*

Each of the five issues raised by defendant Nathaniel L. Hill in this appeal lacks merit. The judgment of the district court is affirmed.