NOT DESIGNATED FOR PUBLICATION

No. 122,864

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.H.,
A Minor Child.


MEMORANDUM OPINION

Appeal from Coffey District Court; SHANNON D. RUSH, magistrate judge. Opinion filed May 28, 2021. Affirmed.

*James C. Heathman*, of Heathman Law Office PA, of Topeka, for appellant natural father.

*Joseph Huerter*, of Tenopir & Huerter, of Topeka, for appellant natural mother.

*Christopher Phelan*, assistant county attorney, and *Wade Bowie II*, county attorney, for appellee.


Before WARNER, P.J., BUSER and CLINE, JJ.


PER CURIAM: EMS personnel transported four-month-old T.H. to Coffey County Hospital after T.H.'s parents reported T.H. fell out of their truck. T.H. was life-flighted to Children's Mercy Hospital, where doctors diagnosed T.H. with traumatic brain injuries and retinal hemorrhaging. The medical team did not believe T.H.'s injuries matched the parents' description of what happened, so they contacted the Kansas Department for Children and Families (DCF). After an evidentiary hearing, the district court adjudicated T.H. to be a child in need of care (CINC) under K.S.A. 2020 Supp. 38-2202(d)(3).

On appeal, T.H.'s parents challenge the sufficiency of the evidence supporting the district court's determination that T.H. was a child in need of care. They also belatedly try to discredit T.H.'s diagnosis of abusive head trauma. Finding no error, we affirm.

1

EMS personnel responded to a 911 call from T.H.'s parents, who reported T.H. was injured after falling out of their Dodge Ram 2500 pickup truck. When EMS personnel intercepted T.H.'s parents on their way to the hospital, T.H. was in a car seat, visibly distraught and crying. EMS transported T.H. to Coffey County Hospital. After examination by a hospital doctor, T.H. was life flighted to Children's Mercy Hospital, where doctors diagnosed T.H. with "abusive head trauma"—formerly known as shaken baby syndrome.

T.H.'s parents told police and doctors they had been working in a pasture for several hours that day. T.H.'s father was driving an all-terrain vehicle and T.H.'s mother was driving a utility terrain vehicle (a Trekker), to check the fence lines of two pieces of property, one which was 80 acres and another which was 40 acres. T.H. was in a car seat, strapped onto the Trekker. The Trekker had no seat belts or car seat hooks, so T.H.'s father used a ratchet belt to attach the car seat.

Both parents reported T.H. was doing fine that day, acting like his normal self. They said he exhibited no problems while riding in the Trekker. T.H.'s mother said they took a break around 5:30 or 6 p.m., when she took T.H. out of the car seat for a feeding. She said she noticed nothing out of the ordinary with T.H. at that time, nor did she notice anything about T.H.'s eyes which caused her concern.

After the feeding, T.H.'s mother claimed she sat T.H. upright in the front passenger seat of their truck, leaving the front passenger door open. She reported standing outside the truck and, as she turned to retrieve the car seat from the back seat, she heard a thud. She claimed she turned around to find T.H. lying face down in the pasture. She said she picked T.H. up and noticed T.H.'s pupils seemed small. She

reported T.H.'s eyes rolled back into T.H.'s head, and T.H. seemed to go limp. The parents said they loaded T.H. up in the car seat, then drove to seek medical care.

Upon examining T.H., a doctor at Children's Mercy Hospital developed concerns that T.H.'s injuries were not consistent with a fall from a truck. The doctor noted T.H. had no bruises, marks, scrapes, cuts, or lacerations to T.H.'s face or head, which would be evident if T.H. had fallen to the ground from a truck's front seat. Instead, the doctors believed the injuries suggested T.H. suffered abusive head trauma caused by shaking or shaking with impact. T.H.'s primary medical team contacted Dr. Terra Frazier, a child abuse pediatrician, to perform an evaluation. She consulted on pediatric cases at Children's Mercy Hospital when a medical team had concerns of physical abuse, sexual abuse, or severe neglect. Dr. Frazier has worked at Children's Mercy Hospital since at least 2011, and she is board certified in child abuse pediatrics. When a child's medical team asked Dr. Frazier to consult, she examined the child, spoke with the medical team regarding medical treatment and condition, met with the family and any caregivers, reviewed the child's medical records and any notes from social workers, and then prepared a report based on her findings.

Dr. Frazier examined T.H. and spoke with the parents and T.H.'s medical providers. She also reviewed T.H.'s medical records. Like the other doctors, she did not believe T.H.'s injuries matched the parents' description of what had happened. DCF became involved and removed T.H. from the parents' care. The State then petitioned for T.H. to be found a child in need of care.

At the temporary custody hearing, Dr. Frazier testified about T.H.'s injuries and the inconsistencies between T.H.'s injuries and the parents' account. She described T.H.'s degree of internal head injuries, including multi-layered retinal hemorrhages too numerous to count and global intracranial injuries such as subdural hemorrhages (bleeding on both sides of the brain and blood between both the right and left

3

hemispheres of the brain), restrictive diffusion areas (shearing injuries) on both sides of TH.'s brain, numerous scattered cortical vein thromboses and blood by the right lateral ventricle. Dr. Frazier noted these injuries were worse than what would be expected from a short distance fall from a truck. She also testified T.H. had trouble feeding and was not very coordinated, due to the nature and extent of his brain injuries.

Dr. Frazier pointed out there were no physical signs of bruising or swelling that would show T.H.'s impact with the ground from a fall. As for T.H.'s retinal hemorrhaging, which went from the back all the way to the periphery of T.H.'s left eye and were also present in T.H.'s right eye, Dr. Frazier noted the pattern of those injuries was typically associated with abusive head trauma. She testified injuries such as those T.H. suffered were consistent with what one would see from "a shaking or shaking impact type motion." She also testified she did not believe riding in a car seat strapped to the back of a Trekker, driving across rugged terrain, caused T.H.'s injuries.

The State asked Dr. Frazier if she had an opinion about whether contact with either parent was appropriate at that time. She said because she could not medically determine which parent was the perpetrator, she would have concerns about T.H. being unsupervised with either parent. Dr. Frazier stated T.H. "would be at risk for further injury or death if returned to an unsafe environment." She explained how T.H. was now more susceptible to brain injury in the future, and if T.H. "were to receive additional trauma on top of [T.H.'s] current trauma that could be even more impactful and potentially fatal."

The district court found the State met its probable cause burden and placed T.H. in the custody of DCF.

A few months later, the district court held a CINC adjudication hearing. The State called several witnesses to testify, including one of the responding paramedics, a doctor

4

from Coffey County Hospital, the Lieutenant Detective on the case, and Dr. Frazier. The paramedic and doctor testified about their assessment and treatment of T.H., and the Lieutenant Detective testified about his criminal investigation. Dr. Frazier's testimony mirrored her testimony from the previous custody hearing. Both parents also testified, repeating their story that T.H. had been riding around for hours in a car seat strapped to a Trekker and then later fell out of the front seat of their truck. They denied shaking, throwing, or hitting T.H.

The parents also presented evidence from John Laughlin, a biomechanical engineer. Laughlin testified he attempted to recreate the forces that would be applied to T.H.'s body when the parents drove T.H. around the pasture. During his experiment, Laughlin placed a crash test dummy about the size of a one-year-old baby into the car seat, then strapped the car seat into the Trekker. The mother then drove Laughlin and the crash test dummy around in the Trekker for around 45 minutes through one of the pastures the parents visited on the day they called 911. Laughlin testified that, based on his experiment, he believed "the forces applied to [T.H.] are consistent in direction with the production of subdural hematomas."

Dr. Frazier testified in rebuttal about her concerns with Laughlin's findings because the dummy he used was not an accurate representation of T.H.'s age, weight, and size of neck. She also pointed out that, in Laughlin's attempted recreation, the dummy never reached the G-force threshold for serious injury, such as subdural hemorrhages, set forth in Laughlin's own report. Further, Dr. Frazier noted Laughlin's report did not address causation for T.H.'s other injuries, such as retinal hemorrhages and shearing to T.H.'s brain. Dr. Frazier again testified she did not believe riding in a car seat strapped to the back of a Trekker, driving across rugged terrain, caused T.H.'s injuries.

After considering the testimony and exhibits at the hearing, the district court determined the State had provided clear and convincing evidence that T.H. was a child in

need of care under K.S.A. 2020 Supp. 38-2202(d)(3). The district court found Dr. Frazier's testimony persuasive, and discounted Laughlin's testimony since he did not address causation for all of T.H.'s injuries. The district court noted:

"As to the . . . allegation that the child has been physically, mentally or emotionally abused or neglected or sexually abused under K.S.A. 38-2202(d)(3), I find that the State has met their burden and find that the child is a child in need of care by . . . clear and convincing evidence.

"While Mr. Laughlin's testimony was . . . gave pause and was interesting in theory, even if this Court were inclined to accept his theory it provided no explanation for the additional injuries that the child sustained other than the subdural hematoma. In testimony Mr. Laughlin indicated that it was possible under his theory that the ride in the Trek[k]er could possibly be the cause of retinal hemorrhages, that appears to be conjecture at best and notably is absent from his report.

"The testing conducted by Mr. Laughlin also leaves some variables unaccounted for and does not explain the child's other injuries. The child in this case suffered bilateral retinal hemorrhages too numerous to count, bilateral subdural hematomas, and parenchymal injury. Further, the Court notes that in my review of the three hundred plus medical pages of medical records that were submitted into evidence, having reviewed all of the evidence and exhibits that were admitted in this case and watched the interviews as well, that there was (sic) other injuries to the child which were not explained either by theory or testimony of Mr. Laughlin or any other explanation for that matter. One of those included a bite mark to the child and as the child did not have teeth [it] could only have been caused by another person who had teeth. But that alone is not dispositive.

"Dr. Frazier testified that these injuries are caused by force beyond the normal care of a child. The injuries would have manifested quickly upon the injury. The injuries here were caused by a force being applied to the child.

"The testimony was that only the parents were the caregiver to the child at the time of the injuries. And the Court would note that pursuant to [*In re B.D.-Y.*], 286 Kan. 686, [187 P.3d 594 (2008)], there is no accompanying requirement that a particular parent be found to have caused the injury through neglect, intent, or otherwise.

"[I] find that the State has met their burden."

The parents challenge the sufficiency of the evidence supporting the district court's determination on appeal. They also newly object to Dr. Frazier's use of the word "abusive" in T.H.'s diagnosis of abusive head trauma, claiming for the first time on appeal this term was misleading to the court. We find there is sufficient evidence in the record to clearly and convincingly support the district court's determination that T.H. was a child in need of care under K.S.A. 2020 Supp. 38-2202(d)(3). We cannot consider the parents' newly asserted evidentiary argument regarding Dr. Frazier's diagnosis terminology since they did not raise it below, nor did they explain why we should consider it for the first time on appeal.

ANALYSIS

The district court found T.H. was a child in need of care under K.S.A. 2020 Supp. 38-2202(d)(3). That provision states: "(d) 'Child in need of care' means a person less than 18 years of age . . . who: . . . (3) has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 2020 Supp. 38-2202(y) defines "'[p]hysical, mental or emotional abuse'" as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered."

In a CINC hearing, the district court must find by clear and convincing evidence that the child meets the statutory definition of a child in need of care. K.S.A. 2020 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. at 705. The clear and convincing standard is an intermediate standard of proof that must be more than a mere preponderance while not beyond a reasonable doubt. 286 Kan. at 693. Evidence is clear and convincing if it is "sufficient to establish that the truth of the facts asserted is 'highly probable.'" 286 Kan. at 696.

When an appellate court reviews a district court's CINC determination, it must review the complete evidentiary record in the light most favorable to the State and determine whether a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the child was in need of care. Appellate courts do not reweigh the evidence, decide the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

On appeal, the parents largely seek a re-evaluation of the evidence presented to the district court, which we cannot provide. They object to how the district court assessed the testimony of the witnesses, now emphasizing certain aspects of Dr. Frazier's testimony and questioning certain aspects of Laughlin's testimony. We cannot travel this path.

District courts often evaluate competing expert testimony, which requires them, when fact-finders, to assess the credibility of each witness and weigh any conflicting evidence to reach a decision that concurs with one opinion and contradicts the other. *State v. Stewart*, 306 Kan. 237, 259, 393 P.3d 1031 (2017). District courts have the authority and responsibility to make a choice to trust one opinion over another. See *State v. Hill*, 290 Kan. 339, 371, 228 P.3d 1027 (2010) (stating that "[t]o the extent [the district court] trusted the opinions originating from the [State's witness] more than those from the defense, [the district court] was entitled to do so").

Our required deference to the district court's findings of fact extends to not only what the witnesses said, but also to the district court's findings on the credibility of those witnesses. See *In re F.C.*, 313 Kan. ___, 482 P.3d 1137, 1143 (2021). Here, the district court weighed Laughlin's opinions against the other evidence presented in the case, including the uncontroverted evidence that T.H. had suffered "bilateral retinal hemorrhages too numerous to count, bilateral subdural hematomas, and parenchymal injury." The district court found Laughlin's theory did not credibly explain T.H.'s injuries, since it only addressed the subdural hematoma injury.

While the parents acknowledge the district court's reasoning for why it discounted Laughlin's testimony, they cite no opinions from Laughlin on causation for T.H.'s other injuries, other than testimony the district court characterized as "conjecture at best." As the district court noted, Laughlin did not account for T.H.'s other injuries in his expert report, and he did not credibly address them in his testimony. On the other hand, Dr. Frazier offered detailed testimony to support her opinion that all of T.H.'s injuries aligned with a diagnosis of abusive head trauma.

Laughlin's theory of injury relies heavily upon facts provided to him by the parents. His attempt to recreate the day's events is based entirely upon their account. It was reasonable for the court to find Dr. Frazier's testimony more credible, and to find Laughlin's testing "leaves some variables unaccounted for." For example, Laughlin never addressed the fact that T.H. had no injuries consistent with suffering a fall from the truck (such as external bruising or cuts), nor did he address the parents' testimony that T.H. was acting normally when they took a break from riding around that evening.

Dr. Frazier testified that, based on her training and experience, symptoms of injuries such as the ones T.H. experienced generally develop immediately or almost immediately after the abusive event. Yet, T.H.'s mother testified T.H. was acting normally before and during the feeding, and only exhibited symptoms after the alleged fall.

When reviewing the record in the light most favorable to the State (as we are required to do), we find there is sufficient evidence in the record to clearly and convincingly support the district court's determination that T.H. was a child in need of care under K.S.A. 2020 Supp. 38-2202(d)(3).

Besides challenging the sufficiency of the evidence to support the district court's determination, the parents also newly question Dr. Frazier's diagnosis of abusive head

9

trauma on appeal, claiming the use of the word "abusive" in the diagnosis improperly impacted the court's analysis of Dr. Frazier's testimony. The parents did not object to Dr. Frazier's diagnosis or her use of the word "abusive" below, nor do they explain why we should consider this argument for the first time on appeal, as required by Kansas Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35).

This court could not consider the parents' new challenge to Dr. Frazier's testimony on appeal, even if we wanted to ignore their violation of Rule 6.02(a)(5), because they never objected to Dr. Frazier's testimony below. Dr. Frazier used the term "abusive head trauma" many times throughout her testimony, providing several opportunities for the parents to object to that language. In fact, counsel for the parents himself repeatedly used the phrase "abusive head trauma" when cross-examining Dr. Frazier.

A party must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. K.S.A. 60-404; *State v. Richmond*, 289 Kan. 419, 428, 212 P.3d 165 (2009). Without a specific objection, we have no particularized findings to review on appeal and thus cannot determine whether the district court erred. Allowing a party to raise evidentiary objections for the first time on appeal conflicts with the appellate court's function, which is that of review rather than trial de novo. *State v. Freeman*, 195 Kan. 561, 564, 408 P.2d 612 (1965).

We find the parents did not properly raise their objection to the terminology Dr. Frazier used in her diagnosis, nor did they explain why this court can consider their evidentiary argument for the first time on appeal.

Affirmed.